# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

_____

### Appeal No.  23-11792
_____

### UNITED STATES,

### Appellee

### v.

### DAVID SCHIEFERLE,

### Appellant

_____

### A DIRECT APPEAL OF A CRIMINAL CASE
### FROM THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA
### DISTRICT COURT CASE NO. 1:22-cr-20083-KMW
_____

### INITIAL BRIEF OF APPELLANT
_____

J. Jervis Wise, Esq.
Brunvand Wise, P.A.
615 Turner Street
Clearwater, FL 33756
Florida Bar # 0019181
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Counsel for Appellant

No. 23-11792

*United States v. Schieferle*

<u>CERTIFICATE OF INTERESTED PERSONS</u>

In compliance with Federal Rule of Appellate Procedure 26.1 and 11th Cir. Rule 26.11, the undersigned hereby certifies that the following listed persons and entities have an interest in the outcome of this particular case:

1. Buschel, Robert, Esquire;

2. Demanovich, Stephen, Assistant United States Attorney;

3. Gonzalez, Juan Antonio, Former United States Attorney;

4. Haguel, Steven H., Esquire;

5. Klepach, Arielle, Assistant United States Attorney;

6. Lapointe, Markenzy, United States Attorney;

7. Louis, Hon. Lauren Fleischer, United States Magistrate Judge;

8.  Matzkin, Daniel, Assistant United States Attorney;

9. McAliley, Hon. Chris M., Former United States Magistrate Judge;

10. Otazo-Reyes, Hon. Alicia, United States Magistrate Judge;

11. Sanchez, Hon. Eduardo I., United States Magistrate Judge;

12. Schieferle, David, Appellant;

13. Silverstein, Joan;

14. Stone, Emily Rose, Assistant United States Attorney;

15. Williams, Hon. Kathleen A., United States District Judge;

16. Wise, J. Jervis, appellate counsel for Appellant Schieferle.

No publicly traded company or corporation has an interest in the outcome of this appeal to the undersigned's knowledge.

C1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Appellant David Schieferle respectfully requests oral argument on this appeal. Counsel believes oral argument will be beneficial to the Court in its resolution of the case, particularly given the volume of the record from the lower court and the complexity, uniqueness, and fact-intensive nature of the issues raised.

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

Certificate of Interested Persons ............................................................ C1

Statement Regarding Oral Argument .....................................................i

Table of Contents .................................................................................ii

Table of Citations................................................................................v

Statement of Jurisdiction.................................................................. ..1

Statement Regarding Adoption.......................................................... ..1

Statement of the Issues.......................................................................2

Statement of the Case.........................................................................3

i)  Course of Proceedings and Disposition in the Court Below ..........................3

ii)  Statement of the Facts ..................................................................11

iii)  Standards of Review......................................................................18

Summary of the Arguments ...............................................................19

Arguments and Citations of Authority................................................21

I.  THE DISTRICT COURT ERRED IN DENYING MR. SCHIEFERLE'S MOTION FOR JUDGMENTS OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PROVE SEVERAL OF THE NECESSARY ELEMENTS OF THE CHARGES.................................................................................21

    A. The Fuel Filters were not Silencers as Defined in the National Firearms Act ..............................................................................23

B. The Government Failed to Prove that Mr. Schieferle Knew of the Features that Allegedly Might Qualify the Items as "Silencers" .............29

C. The Government Failed to Prove that Mr. Schieferle Knowingly Imported or Brought into the United States the Alleged Silencers .........32

II.   THE DISTRICT COURT SIMILARLY ERRED IN DENYING MR. WAITERS' MOTION TO SUPPRESS THE STATEMENTS MADE DURING THE CUSTODIAL INTERROGATION........................34

A. Law Enforcement's Affidavit Failed to Establish Probable Cause for the Issuance of a Search Warrant for Mr. Schieferle's Home ...........35

1. The Facts Alleged in the Affidavit did Not Support the District Court's Conclusion that the Affidavit Provided a Substantial Basis to Conclude that the Seized Items Were "Intended for Use in Assembling or Fabricating a Firearm Silencer" ...................................35

2. Notwithstanding the Foregoing, the Search Warrant Failed to Establish Probable Cause for the Proposed Offenses Alleged in the Search Warrant Application ......................................................41

B. The Good Faith Exception did not Apply Because the Affidavit Misled the Magistrate Judge and Omitted Critical Facts that Would Have Negated the Existence of Probable Cause .........................45

III.  THE SECOND AMENDMENT PROTECTS THE RIGHT TO POSSESS FIREARMS FOR SELF-DEFENSE IN AND OUTSIDE OF AN INDIVIDUAL'S HOME ................................................................48

Conclusion ........................................................................................53

Certificate of Compliance with Rule 32(a).............................................54

Certificate of Service ...........................................................................55

## <u>TABLE OF CITATIONS</u>

**<u>Cases</u>**                                                                **<u>Page</u>**

*Agan v. Vaughn*, 119 F.3d 1538 (11th Cir. 1997)....................................................18

*Caetano v. Massachusetts*,
    577 U.S. 411, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016).....................................50

*District of Columbia v. Heller*,
    554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)............................. 48-50

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. ---, 142 S. Ct. 2228, 2267, 213 L.Ed.2d 545 (2022)........................49

*Franks v. Delaware*,
    438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)...................................6, 47

*Illinois v. Gates*,
    462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)...................................7, 9

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
    597 U.S. ---, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)............................. 48-50

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016) .....................................27

*Staples v. United States*,
    511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)...................................23

*United States v. Brundidge*, 170 F.3d 1350 (11th Cir. 1999) ...............................35

*United States v. Corrigan*, 144 F.3d 763 (11th Cir. 1998) ....................................18

*United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010) ............................. 24-25, 27

*United States v. Farley*, 607 F.3d 1294 (11th Cir. 2010) .....................................18

*United States v. Hall*, 171 F.3d 1133 (8th Cir. 1999)...........................................25

## <u>TABLE OF CITATIONS, Continued</u>

**<u>Cases (Cont.)</u>**                                                   **<u>Page</u>**

*United States v. Lanier*,
    520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)....................................27

*United States v. McCrimmon*, 362 F.3d 725 (11th Cir. 2004)...............................18

*United States v. Moore*, 253 F.3d 607 (11th Cir. 2001) ........................... 23, 30-31

*United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988)......................................22

### <u>Statutes and Rules</u>

18 U.S.C. § 2 .........................................................................................................5

18 U.S.C. § 545 ......................................................................................... 3, 41-43

18 U.S.C. § 921 ................................................................... 4, 8, 22-24, 28, 51

18 U.S.C. § 922 ......................................................................5, 22, 32, 52

18 U.S.C. § 924 ......................................................................................5, 52

18 U.S.C. § 3231 ...............................................................................................1

26 U.S.C. § 5844 ......................................................................... 3, 8, 42-43

26 U.S.C. § 5845 ...........................................................................................26

26 U.S.C. § 5861 ......................................................... 3, 5, 8, 42-43, 52

26 U.S.C. § 5871 ...............................................................................3, 43

28 U.S.C. § 1291 ...............................................................................................1

11th Cir. R. 26-11 ...............................................................................C1

## **TABLE OF CITATIONS, Continued**

**Statutes and Rules**                                                 **Page**

11th Cir. R. 28-1 ...................................................................................54

FED. R. APP. P. 26.1 ...............................................................................C1

FED. R. APP. P. 28 ....................................................................................1

FED. R. APP. P. 32 ..................................................................................54

## <u>STATEMENT OF JURISDICTION</u>

Under 28 U.S.C. § 1291, the courts of appeal have jurisdiction from all final decisions of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

The United States District Court, Southern District of Florida, Miami Division, had jurisdiction pursuant to 18 U.S.C. § 3231. The district court entered its final judgment and commitment order on May 24, 2023. (Doc. 146.) Mr. Schieferle filed a timely notice on May 25, 2023. (Doc. 147.)

## STATEMENT OF THE ISSUES

I.    Whether the district court erred in denying the Appellant's motion for judgments of acquittal on charges of illegal importation of firearms and possession of an unregistered firearm when the charges arose from the Appellant's purchase of inline fuel filters from an online retailer?

II.    Whether the district court erred in denying the Appellant's motion to suppress the fruits of a search of his home when the Appellant asserted that the search warrant affidavit failed to provide probable cause to believe a crime was committed or was being committed?

III.    Whether the Second Amendment protects the right of an individual to possess items that might be considered "firearm silencers"?

## STATEMENT OF THE CASE

**(i)    Course of Proceedings and Disposition in the Court Below**

Appellant David Schieferle has no prior criminal history, worked as a federal air marshal, and served in the United States Army Reserves.  (Doc. 162 at 49.)  The charges at issue in this case stemmed from Mr. Schieferle having made online orders of inline fuel filters, some of which could also serve as firearms cleaning solvent traps, but which also purportedly could be converted to serve as firearms silencers. (Doc. 162-164.)

On December 17, 2020, law enforcement sought a search warrant for Mr. Schieferle's home. (Doc. 162 at 48.)  The application for the search warrant stated that the requested search would be for a violation of 18 U.S.C. § 545 (Smuggling Goods into the United States) and 26 U.S.C. §§ 5844, 5861(k) and 5871 (Receipt or Possession of an Unlawfully Imported Firearm). (Doc. 83-1 at 4.)  The affidavit submitted in support of the application alleged that U.S. Customs and Border Protection had inspected two packages travelling via the U.S. Postal Service from China to the target address. (Doc. 38-1 at 6-8.)  The packages were alleged to contain "suppressors" and purportedly originated from an address in China "known to be associated with suppressor shipments." (Doc. 38-1 at 6.)  The affidavit further stated that the alleged suppressors were "capped on one end and require a modification step to drill through the suppressor to allow the round to be projected through." (Doc. 38-

1 at 6.) It went on to allege that "[t]hese suppressors are often packaged and labeled to mislead law enforcement. That is, on the shipping labels, they are identified as auto repair tools, fuel filters, adapters, solvent filters, and other misleading titles to avoid detection of their actual intended use." (Doc. 38-1 at 7.) The affiant opined "I believe the combination of parts contained in the packages that are the subject of this investigation, discussed below, were designed and intended for use in assembling or fabricating a firearm silencer as defined in 18 U.S.C. § 921(a)(24)..." (Doc. 38-1 at 7.)

The affidavit additionally set out that, under the National Firearms Act, ATF may provide approval for the making of a silencer by filing "ATF form 1," applying for approval, paying a $200 tax, and complying with all other applicable provisions of law. (Doc. 38-1 at 9.) The affidavit alleged that Mr. Schieferle "did not file the appropriate forms or obtain approval from ATF that would allow him to legally receive the suppressor shipments in this case." (Doc. 38-1 at 9.) The affidavit did not discuss legitimate purposes, unrelated to firearm report suppressing, that inline fuel filters and solvent traps can perform. (Doc. 38-1.)

The United States Magistrate Judge went on to issue a search warrant for Mr. Schieferle's residence. (Doc. 38-1 at 19-24.) That warrant was executed as discussed below. During the search, law enforcement seized a laptop computer, a cellular phone, and a box labeled "Solvent Tube" that contained an item that the

Government purported to be a silencer. (Doc. 38 at 1.)

On March 8, 2022, Mr. Schieferle was charged in the Southern District of Florida, Miami Division, in an Indictment that alleged two counts of Illegal Importation of a Firearm or Ammunition pursuant to 18 U.S.C. §§ 922(l) and 924(a)(1)(C) and one count of Possession of an Unregistered Firearm pursuant to 26 U.S.C. § 5861(d) and 18 U.S.C. § 2. (Doc. 3.)

On August 26, 2022, Mr. Schieferle filed a motion to suppress the fruits of the search of his home. (Doc. 38.) The motion set out that the items that were seized at the airport and the item that was contained in the box at Mr. Schieferle's home were oil filters and inline filters that had a legal and legitimate use in farm equipment for filtering out debris such as rust and paint chips from farm fuel storage tanks that Mr. Schieferle had on his farm. (Doc. 38 at 2.) Mr. Schieferle indeed resided on a farm as discussed below. (Doc. 162 at 78.) To provide an example of the nature of the items, Mr. Schieferle cited an Amazon.com webpage. (Doc. 38 at 2 *citing* https://www.amazon.com/fuel-filter-solvent-trap/s?k=fuel+filter+solvent+trap.) The motion further set that Mr. Schieferle legally purchased the items at issue on internet websites. (Doc. 38 at 2.)

Mr. Schieferle asserted in the motion that the affidavit filed in support of the search warrant application failed to establish probable cause for the issuance of a warrant. (Doc. 38.) In support of that position, Mr. Schieferle argued in detail that

the affidavit did not allege that something inherently illegal, such as a controlled substance, was likely to be found in the home. (Doc. 38 at 10.) On the contrary, the affidavit proposed that the home may contain an item that, in its present form, could be modified to qualify as illegal contraband if it were to be so modified without ATF approval. (Doc. 83 at 10.) The motion included an affidavit from a firearms expert who would later testify as trial and who opined that "these solvent traps cannot serve as a silencer until they are machined, cut and threaded to fit onto a firearm." (Doc. 38-2 at 4.)

The motion asserted that the search warrant did not present sufficient facts to establish probable cause. (Doc. 83 at 5.) It additionally asserted that "[t]o the extent that the Magistrate could have misinterpreted the allegations based upon semantics in the search warrant affidavit, justify a Franks hearing." (Doc. 83 at 5 *citing Franks v. Delaware*, 438 U.S. 154, 169, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

The Government filed a response to the motion to suppress on September 16, 2022. (Doc. 43.) The Magistrate Judge heard argument on the motion on September 30, 2022. (Doc. 155.) At the hearing, the Magistrate Judge noted that the search warrant application proposed that the potential crimes underlying the warrant application were different from the alleged offenses Mr. Schieferle was ultimately charged with. (Doc. 155 at 23.) The court concluded the hearing by directing the parties to file supplemental briefing on the question of whether the affidavit

established probable cause for the two alleged crimes that the affidavit relied on. (Doc. 155 at 48.) The parties thereafter filed supplemental briefs as directed. (Doc. 54, 61.)

On November 30, 2022, the Magistrate Judge submitted a Report and Recommendation recommending that the motion to suppress be denied. (Doc. 74.) The Report and Recommendation reasoned in part:

> In his Motion, Defendant argued that the products shipped to him from China were "oil filters or inline filters" used in farm equipment, and at the hearing he argued that they were "solvent traps" which have the legitimate use to collect oil and solvents when a firearm is cleaned. Defendant further argued that these could only become a "suppressor" if Defendant intended to modify them for use as a suppressor, and that the Warrant Application failed to provide probable cause that Defendant had that intent.
>
> Defendant is correct that the Warrant Application does not expressly identify facts to support a finding that Defendant intended to drill a hole through the capped end of the suppressors, so that they could function as such. The Application, however, did not need to present evidence that Defendant intended to drill a hole in the products being shipped to his home; it needed to demonstrate probable cause that the products were being imported with the intent that someone would take that step so that they could function as a suppressor, and that evidence of the suspected crime would be found at Defendant's home.
>
> In his argument, Defendant asks too much of the probable cause standard. To issue a search warrant, a judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her] … there is a fair probability that contraband or evidence of a crime will be found at", in this case, Defendant's home. *Gates*, 462 U.S. at 238.

(Doc. 74 at 10-11.)  The court went on to conclude that the facts before the issuing court provided "'a substantial basis' *id.*, for the issuing judge to conclude that there was probable cause that the many devices shipped to Defendant's home were 'intended for use in assembling or fabricating a firearm silencer.'" (Doc. 74 at 12 *quoting* 18 U.S.C. § 921(a)(25).)  The court then, however, noted that the inquiry did not end there and consequently turned to the question of whether the affidavit was sufficient to provide probable cause for the offenses alleged in the warrant application:

> From the language of the statute itself it appears that the Title 26 offense alleged in the Application requires proof that someone received or possessed a silencer that was imported into the United States, in violation of section 5844. 26 U.S.C. § 5861(k). Section 5844, in turn, requires proof that the importer (Defendant here) shows, pursuant to "regulations as may be prescribed by the Secretary" that the firearm (here, suppressors) will either be used by the United States, or for scientific or research purposes, or for testing by a registered manufacturer. 26 U.S.C. § 5844. The Application does not identify any regulations "prescribed by the Secretary" pursuant to § 5844, and it does not state whether Defendant met these requirements.

> The Affidavit does state that ATF advised that Defendant "does not have a Federal Firearms License or National Firearms Act/tax stamps, which are necessary to legally import suppressors." (Aff. at ¶ 17). Later, the Agent writes: "Furthermore, our investigation revealed that [Defendant] did not file the appropriate forms or obtain approval from ATF that would allow him to legally receive the suppressor shipments in this case." (Id. at ¶ 19). While these conclusory statements are consistent with a finding of probable cause, they do fall short. The Agent does not identify "the appropriate forms" or means of ATF "approval" required before Defendant could receive the shipments. The Application never expressly ties the evidence alleged therein to the elements of the two crimes that are the basis of the Application and

Warrant, which is what would allow for a clear assessment of probable cause.

I lean heavily on this guidance from the *Gates* Court to resolve the Motion: "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Gates*, 462 U.S. at 237 n.10 (quotation marks and citation omitted). Applying this standard of "great deference", id. at 236, I conclude that the issuing judge had a "substantial basis" to conclude that the warrant was supported by probable cause, id. at 239, and that the Motion should therefore be denied.

(Doc 74 at 13-15.)  The court went on to hold that, if it was incorrect that probable cause existed to support the warrant, the good faith exception should nonetheless apply to preclude suppression of the fruits of the warrant. (Doc. 74 at 15-19.)

On November 29, 2022, over Mr. Schieferle's objections, the district court adopted the Report and Recommendation and denied the motion to suppress. (Doc. 160 at 2.)

The case then proceeded to a jury trial beginning on December 5, 2022. (Doc. 161.)  The Government called as witnesses various law enforcement officers to testify to the facts below.

At the close of the Government's case, Mr. Schieferle moved for a judgment of acquittal, asserting that the Government failed to prove that the items purported to be silencers were illegal to possess and that Mr. Schieferle had intent to use those

items as silencers. (Doc. 163 at 100-04.)  The district court denied that motion, stating:

> THE COURT: The standard at this juncture is to view the evidence in the light most favorable to the United States. I believe the record demonstrates the case must proceed at this stage to the jury.
>
> There is not only sufficient circumstantial evidence as to Mr. Schieferle's possession of an unregistered silencer but also his importation of devices; devices which Government experts have stated, despite whatever title was on a package, had no other purpose but to be a muffler. And there is also circumstantial evidence of Mr. Schieferle's intent, demonstrated by some of the search items found on his cell phone and laptop, clear evidence of his familiarity with firearms, firearm components, with matters relating to firearms and suppressors.
>
> The potato, Coke bottle argument I think is a red herring of sorts. That really does not enter into an analysis for the -- at least in this Court's opinion -- for the reason that a potato is meant to be an edible item and a Coke bottle contains a beverage.
>
> The testimony here is that these pieces of equipment that Mr. Schieferle had and had ordered had no other purpose than to be suppressors for firearms. So I will deny the defendant's motion for judgment of acquittal at this time; with of course the defendant's ability to raise it after he has presented his case.

(Doc. 163 at 105-06.)

Mr. Schieferle went on to call as an expert witness, Richard Vasquez, whose testimony is discussed below.  The Government, in rebuttal, recalled its firearms expert.

At the close of the evidence, Mr. Schieferle renewed his motion for a judgment of acquittal. (Doc. 165 at 25.)  The court reserved ruling on the motion. (Doc. 165 at 25.)

On December 9, 2022, the jury returned a verdict of guilty as charged on the three counts. (Doc. 104.)

On December 22, 2023, Mr. Schieferle filed a renewed Motion for Judgment of Acquittal or, Alternatively, Motion for New Trial. (Doc. 115.)  The Government filed a Response on March 10, 2023. (Doc. 127.)

At the outset of the sentencing hearing, the district court denied that motion. (Doc. 164 at 3-5.)  The court went on to impose concurrent sentences of eight months incarceration to be followed by three years of supervised release on each count. (Doc. 146.)  The court entered its judgment May 24, 2023. (Doc. 146.)  Mr. Schieferle filed a notice of appeal the following day. (Doc. 147.)

He remains incarcerated on the judgment and sentence at issue.

**(ii)**  <u>**Statement of the Facts**</u>

Customs and Border Patrol officers at Chicago International Airport detained two packages that were flagged for inspection on or about November 24, 2020. (Doc. 162 at 12, 15-16, 33, 77.)  The packages were mailed from an address in China and listed David Schieferle as the intended recipient. (Doc. 162 at 19.)

One of the packages was later examined on December 1, 2020 and the second

was examined on December 14, 2020. (Doc. 162 at 77.)    The    first    package
contained ten items that the Government purported to be silencers. (Doc. 162 at 16.)
The packaging described the items contained therein as "003 WI X2403 solvent."
(Doc. 162 at 19-20.)  The items that were alleged to be silencers were described as
metal cylinders with an inner chamber, O ring, and an end cap.  (Doc. 162 at 21.)
The end caps had a center marking that an agent purported to have been for the
purposes of providing a point to drill through in order, allegedly, for a projectile to
pass through. (Doc. 162 at 38.)  Two of the ten items contained "monocore" or
"monolithic" baffles on the interior that already had holes through the center. (Doc.
162 at 40.)  The package also contained blue rubber tubing and several whistles.
(Doc. 162 at 21, 43.)

The December 14th package contained two items purported to be silencers.
(Doc. 162 at 29, 39.)  The package described its content as adaptors. (Doc. 162 at
46.) The items contained inside were described at trial as barrel cylinders with an
end cap and "capsules" on the inside. (Doc. 162 at 30.)

The items at issue did not contain any serial numbers or identifying markings.
(Doc. 162 at 49.)  The items all contained dimples on the end caps but not holes.
(Doc. 162 at 79.)

When law enforcement later executed the search warrant discussed above, it
saw that Mr. Schieferle's residence was on a farm. (Doc. 162 at 78.)  Present on the

property were tractors, motorized equipment, and fuel storage tanks. (Doc. 162 at 79.)  Mr. Schieferle's property also contained several large shipping containers that held numerous items that had no relation to the instant case. (Doc. 162 at 50-52.) The search of the property revealed that Mr. Schieferle appeared to order, receive, and store numerous random items from retailers such as Amazon. (Doc. 162 at 77-78.)

Various legal firearms and firearms-related items were found on Mr. Schieferle's property. (Doc. 162 at 49-65, 76.)  Those firearms were not seized. (Doc. 162 at 65.)  The firearms were secured in safes in the home. (Doc. 162 at 80-82.)  In addition to firearms, air rifles were also in the home. (Doc. 162 at 67.)

An item purported at trial to be a "firearm silencer" was collected on a dining table. (Doc. 162 at 74.)  It was described as "black in color, containing a hollow tube with two end-caps, one which was internally threaded and one with a marking in the center, and it also had the internal parts such as the baffles." (Doc. 162 at 75.)  The item was inside of a closed box. (Doc. 162 at 82.)  On the box the item was contained in was written "solvent tube." (Doc. 162 at 97.)  The item did not contain a serial number or other such identifying marking. (Doc. 162 at 97.)  No firearms were present in the room where that box was found. (Doc. 162 at 100.)  The box was, on the contrary, surrounded by numerous other boxes and various items unrelated to firearms. (Doc. 109-7.)  The officer who collected the box could not say whether or

not he was the first person who would have opened the box that the purported silencer was contained in. (Doc. 162 at 98.)  The box had a shipping label that indicated that the package had been mailed from an address in New Jersey. (Doc. 162 at 97-98.)

A laptop computer and cellular phone were seized during the search. (Doc. 162 at 69.)  A forensic extraction of the seized laptop indicated that the computer had accessed a YouTube video titled "The Cheapest Suppressor" on November 3, 2020. (Doc. 162 at 117-18.)  No evidence existed however to indicate that Mr. Schieferle searched for the term "cheapest suppressor." (Doc. 163 at 29.)  Likewise, no evidence existed to indicate that Mr. Schieferle clicked on the video or otherwise played or viewed it. (Doc. 163 at 30.)

The extraction also showed that a site was accessed on AliExpress.com titled "solvent trap hyphen buy solvent trap with free shipping" on November 12, 2020. (Doc. 162 at 120-21.)  Ali Express is an online shopping site based in China that is similar to Amazon.com. (Doc. 162 at 73.)  A search of the phone showed an order on that website for two items that were described as a "NAPA 4003 WIX, a solvent trap." (Doc. 162 at 75.)

The computer had also accessed various volumes of a publication titled "Poor Man's James Bond." (Doc. 162 at 122; 163 at 4-5.)  A portion of the publication discussed silencers. (Doc. 162 at 123; 163 at 4-5.)  The publication was, however,

described as "very large" and discussed numerous other topics in addition to silencers. (Doc. 162 at 91-92.)

At trial, the Government presented as an expert witness a firearms enforcement officer for the Bureau of Alcohol, Tobacco, Firearms and Explosives. (Doc. 163 at 38.) The officer described the characteristics of a silencer as having "an outer tube, does it have the caps on the end -- the end-caps that house everything in the middle -- and does it have something in the middle that helps in reducing the sound of a firearm when shot." (Doc. 163 at 42.)

The officer opined that the various items that were seized from the mailings qualified them as silencers. When asked to describe the reasons for his opinion, he testified:

> All right. As we are going from left to right left will be the side of the firearm it attaches to and right will be the side of where the front is and where the bullet would exit. As we see here we have an outer tube. I will remove the rear end-cap, which unscrews. So, if we look down the center here there is a center hole, and that hole is threaded as you can see right here.

(Doc. 163 at 52, 55, 61-62.) With respect to the two items that contained the monocore or monolithic baffles, the officer testified that he could hold the items up to light and see through them, thereby allowing them to serve as functional silencers. (Doc. 163 at 56-57.) The remaining items contained cone style baffles that would need to be drilled through before a projectile could potentially pass through. (Doc. 162 at 38-41, 47-48.) The officer had tested one of the monolithic baffle items on

a firearm and found that it reduced the noise level of the firearm by 17 decibels. (Doc. 163 at 58.)

The officer additionally testified that solvent traps are used to attach to the end of a firearm barrel to capture any solvent that leaks out during the process of cleaning the gun. (Doc. 163 at 65.)  He gave the opinion that the items at issue would not make sense for use as solvent traps or fuel filters. (Doc. 163 at 66-68.)  The officer testified on cross-examination, nonetheless, that it is legal to possess solvent traps and inline fuel filters. (Doc. 163 at 83.)  He further testified that the items had characteristics of solvent traps. (Doc. 163 at 85.)  He believed that the items would not be effective as fuel filters because they did not contain filtering elements. (Doc. 163 at 85.)The officer additionally testified that empty two liter bottles or PVC pipes can serve as silencers. (Doc. 163 at 88.)

Mr. Schieferle called as an expert witness a retired ATF agent who now operates two consulting businesses. (Doc. 163 at 107-08.)  The expert had served 14 years with the ATF, as a firearms enforcement officer before being promoted to serve as assistant chief of the Firearms Technology Branch and then as acting chief of the Firearms Technology Branch. (Doc. 163 at 108-09.)  While with the ATF, he had written standard operating procedures on evaluating silencers and firearms. (Doc. 163 at 111.)  In all, the expert had worked in the firearms industry since 1974. (Doc. 163 at 111.)

16

The expert testified that the ten cone style baffle items could not serve as functional silencers in their present form. (Doc. 164 at 4-5.)  With respect to the monolithic baffles, the expert testified that they could serve as silencers but could also serve as solvent traps. (Doc. 164 at 5.)  He further testified that those items could also serve as inline fuel filters with modification. (Doc. 165 at 5-6.)  Such items, the expert testified, are available from retailers such as Walmart and Amazon. (Doc. 165 at 9.)

The expert went on to testify that any object that can be attached to a firearm muzzle can serve as a silencer if it has a chamber or opening that allows gas to slow as it leaves the firearm barrel. (Doc. 165 at 6-7.)  The expert provided as examples of objects that can serve as silencers as a lawn mower muffler,[1] a Febreeze bottle, a lighter fluid bottle, and a PVC pipe. (Doc. 165 at 7.)  He further testified that purported silencers can be attached to air rifles. (Doc. 165 at 10.)  Such air powered guns would not qualify as firearms. (Doc. 165 at 10.)

Mr. Schieferle was later convicted and sentenced as set forth above.

This appeal follows.

---

[1] The transcript states only "lawn mower" but the circumstances seem to indicate that the witness stated or intended to state "lawn mower muffler." (Doc. 165 at 7.)

**(iii)**    <u>**Standards of Review**</u>

As to Issue I, This Court reviews *de novo* a district court's denial of a motion for judgment of acquittal. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004).

As to Issue II, this Court reviews the denial of a motion to suppress under a mixed standard of review. *United States v. Farley*, 607 F.3d 1294, 1325-26 (11th Cir. 2010).  The trial court's legal conclusions are reviewed *de novo*, while its factual findings are reviewed for clear error. *Id.*

As to Issue III, this Court reviews *de novo* the constitutionality of a law's application as applied in a particular case. *United States v. Corrigan*, 144 F.3d 763, 768 n.4 (11th Cir. 1998) *citing Agan v. Vaughn*, 119 F.3d 1538, 1541 (11th Cir. 1997).

## SUMMARY OF THE ARGUMENTS

The Government failed to present sufficient evidence to sustain any of the three convictions against Mr. Schieferle.  For one, the evidence failed to prove that the filters that Mr. Schieferle ordered met the statutory definition of a "silencer" because the items had intended purposes other than to muffle a firearm.  In addition, the evidence failed to prove that Mr. Schieferle 1) had knowledge of the features that purportedly could have allowed the items to serve as silencers or 2) intent to actually use those items as silencers.  As the evidence established, the items at issue were marketed as solvent traps and inline filters and had characteristics consistent with such devices.  Mr. Schieferle, moreover, had legitimate uses for such objects on his farm.  He, likewise, had taken no steps towards modifying or otherwise using the items as silencers. Finally, with respect to the two importation charges, the Government failed to prove that Mr. Schieferle knew the items he ordered would be imported from outside the United States.

The district court additionally erred in denying the motion to suppress the fruits of the search of Mr. Schieferle's home.  The search warrant affidavit wholly failed to provide facts sufficient to justify a conclusion that evidence of any crime would be found at Mr. Schieferle's home.  Moreover, because the affidavit omitted critical facts and misled the issuing court in reckless disregard for the truth, the good faith exception to the exclusionary rule did not apply.

Finally, notwithstanding that the items at issue were not silencers and that Mr. Schieferle did not intend to use the items as silencers, the Second Amendment protected the right of an individual to possess silencers and other firearms in self-defense. On that additional ground, the district court further erred in denying Mr. Schieferle's motion for a judgment of acquittal.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### I.

### THE DISTRICT COURT ERRED IN DENYING MR. SCHIEFERLE'S MOTION FOR JUDGMENTS OF ACQUITTAL BECAUSE THE GOVERNMENT FAILED TO PROVE SEVERAL OF THE NECESSARY ELEMENTS OF THE CHARGES.

Appellant Schieferle was an owner and operator of a farm who correspondingly had legitimate needs for inline fuel filters. The evidence presented at trial established that the items at issue in this case were marketed and sold by legitimate online retailers as solvent traps and inline filters. Those items, moreover, had the ability to serve as solvent traps and, with modification, as inline filters. Given the evidence presented at trial, even when viewed in a light most favorable to the Government, the items at issue could not qualify as "silencers" under the plain text of the statutory definition. Furthermore, based on the evidence, the Government did not and could not prove that Mr. Schieferle had knowledge of the purported features that might otherwise allow the filters to be used as silencers. Finally, with respect to the charges of illegal importation, the evidence failed to show that Mr. Schieferle had knowledge that the filters he ordered would be imported from outside the United States. For all of those reasons, the district court erred as a matter of law in denying the motion for judgments of acquittal.

21

This Court has held that it will reverse a conviction if it finds that "a reasonable mind must entertain reasonable doubt about the guilt of the defendants." *United States v. Parker*, 839 F.2d 1473, 1477 (11th Cir. 1988). In making that determination, the Court "consider[s] the evidence in a light most favorable to the government, drawing all reasonable inferences from the evidence and resolving all credibility choices in favor of the verdict." *Id.* Even under that deferential standard, the evidence was far from sufficient to sustain any of the three charges at issue in this case.

18 U.S.C. 922(l), which provides for the offense charged in Counts One and Two of the Indictment, provides:

> (l) Except as provided in section 925(d) of this chapter, it shall be unlawful for any person knowingly to import or bring into the United States or any possession thereof any firearm or ammunition; and it shall be unlawful for any person knowingly to receive any firearm or ammunition which has been imported or brought into the United States or any possession thereof in violation of the provisions of this chapter.

18 U.S.C. § 922(l). Section 921 correspondingly defines a firearm as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device…" 18 U.S.C. § 921(a)(3). It then, in turn, defines the terms "firearm silencer" and "firearm muffler" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts,

22

designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).  The plain text of that definition is critical to this Appeal.

To sustain a conviction for Possession of an Unregistered Firearm, the Government must prove beyond a reasonable doubt that the defendant "knew of the features of the 'firearm' that brought it within the scope of the National Firearms Act, 26 U.S.C. §§ 5801-5872." *United States v. Moore*, 253 F.3d 607, 609 (11th Cir. 2001) *citing Staples v. United States*, 511 U.S. 600, 619, 114 S.Ct. 1793, 1804, 128 L.Ed.2d 608 (1994).  Therefore, as to all three of the charges alleged in the Indictment, the Government bore the burden of proving that the items at issue qualified as "silencers" and that Mr. Schieferle had knowledge that the items at issue possessed the features necessary to qualify them as firearms.  The Government failed on both accounts.

**A. <u>The Fuel Filters were not Silencers as Defined in the National Firearms Act</u>**

The plain text of the "silencer" definition essentially includes "any combination of parts, designed or redesigned, *and intended for use* in assembling or fabricating a firearm silencer or firearm muffler" and "any part *intended only* for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).  Given that definition, the inline fuel filters, which the evidence established are sold by legitimate retailers in

the United States, cannot qualify as silencers on their own because they are not intended for use as a firearm silencer.  Despite the testimony from the Government witnesses that manufacturers purportedly market solvent traps and inline fuel filters as a ruse, the fact remains that the items were marketed to the public, to include Mr. Schieferle, for intended uses as solvent traps and inline filters.  Given the intended purposes for which the items were marketed, coupled with the plain text of the statutory definition, none of the alleged silencers at issue qualified as silencers under Subsection 921(a)(25).

The First Circuit addressed a scenario analogous that of the instant case in *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010).  In that case, law enforcement had intercepted a mailing that contained a "large caliber airgun" and "a cylinder made of black metal with a hole running through it, threading that allowed attachment to the muzzle of the airgun and baffles inside." *Id.* at 95.  The purported silencer was apparently homemade. *Id.* at 99 n.4.  Law enforcement also later found evidence connecting the defendant to an article titled "Federal Law Definition of a Silencer." *Id.*  That article "noted that it might be argued that an airgun silencer, if it could be 'put to use on a powder burning firearm ... might be a silencer' under federal law; the article argued that such a device would not be a silencer because not intended for firearm use even though it 'could probably be adapted for use as a silencer on a powder burner.'" *Id.*  The defendant was thereafter charged, tried and

convicted of transporting a firearm in interstate commerce as a convicted felon based on that purported silencer. *Id.* At trial, the Government presented additional evidence that the defendant had "knowledge of firearms and technical skill" and "interest in silencers and their lawfulness." *Id.* at 96. The Government also called an expert to testify "that the seized device could be used to muffle the sound of an ordinary firearm in various ways, including the holding of the device against the barrel of the firearm with one's hand so that the bullet would pass through the device." *Id.* The witness, however, for safety purposes, had conducted test firing of the silencer "by threading an 'adapter' onto both the barrel of an ordinary gun and the silencer to connect the two implements, because the silencer did not fit directly to the testing pistol." *Id.*

When the case reached the First Circuit, the court recognized that "[i]n the ordinary criminal case, the device charged as a silencer is one manufactured for use with a firearm and is easily connected (*e.g.,* by threading one onto the other); and the possessor knows perfectly well the intended function of the device." *Id.* at 96-97 *citing United States v. Hall*, 171 F.3d 1133, 1152 (8th Cir. 1999), *cert. denied,* 529 U.S. 1027, 120 S.Ct. 1437, 146 L.Ed.2d 326 (2000). It reasoned, on the other hand, that the *Crooker* case was problematic because the alleged silencer was intended for use with an airgun and required modification to be used as a firearm silencer. *Id.* at 97. The court found the "problems arise in two different dimensions:

its capability for use as a silencer and, separately, the defendant's knowledge, purpose or both with respect to the device." *Id.*

In addressing those problems, the court concluded that the statutory definition of a silencer "by its terms requires something more than a potential for adaptation and knowledge of it." *Id.*   The court plainly noted that "[t]he statute does not refer either to capability or adaptation; it speaks of a device 'for' silencing or muffling." *Id.* The court then reasoned that "the airgun silencer in this case required a further 'part' (the adapter), arguably making the case fall within one of the 'parts' definitions that require intent. Worse still for the government, the use of a 'capability' and 'knowledge' definition-as applied to a home-made silencer-could also extend to a soda bottle or even a potato." *Id.*  The court then distinguished the statutory definition of "silencers" from the statutory definition of a "machine-gun." *Id.* at 98.  The court noted that the machine gun definition, in contrast to the silencer definition, "explicitly adopts a test of objective capability: it covers any weapon '*which shoots,* is designed to shoot, *or can be readily restored to shoot*' automatically multiple shots with a single trigger pull." *Id. quoting* 26 U.S.C. § 5845(b) (emphasis in original). The court correspondingly found "the range of physical objects that *can* muffle a firearm is so large and of so many alternative uses that some filtering restriction is needed to prevent overbreadth and possibly vagueness."  The court went on to reverse the defendant's conviction and remand

for entry of a judgment of acquittal. *Id.* at 100. In so holding, the court provided:

> To read the statute literally, as we do, is conventional with criminal statutes in order to provide fair notice, *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), and in this instance tempers problems of overbreadth and vagueness created by the multiple legitimate objects that can be used to silence a firearm. Conversely, the fact that a possessor does have a purpose to use, or to pass on the device to someone to use, as a silencer for a *firearm* increases the danger of such a use and makes it precisely the threat against which the statute means to guard.
>
> Of course, this literal construction poses no barrier to prosecuting anyone who knowingly possesses a commercial silencer. In such a case, it would be suitable to charge that the jury need only find that the defendant knowingly possessed a device designed to be used as silencer for firearm. The defendant's purpose becomes a pivotal issue only for a device not so designed, but that is the case before us; or at least the government's evidence and arguments leave it in that posture.

*Id.* at 99; *see also Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 603 (1st Cir. 2016) (recognizing "the standard under the NFA's silencer definition focuses on the relevant part's intended use rather than on uses of which the relevant part is merely capable" and holding "[t]hus, while the fact that this part incidentally reduces the gun's rise and recoil shows that it is capable of doing so, that fact is not necessarily determinative of whether Sig Sauer intended this part to be used for that purpose.")

As in *Crooker*, the items at issue in the instant case were not "commercial silencers" and were instead marketed as serving a function other than silencing a firearm. Given the plain text of the statutory definition, those items could not thereby qualify as silencers. Indeed, just as in *Crooker*, the evidence established that

any of the alleged silencers could have been used as airgun silencers. The evidence likewise established that Mr. Schieferle owned and possessed airguns in his home. Still, notwithstanding the potential application of the items as airgun silencers, the uncontroverted testimony established that the items at issue could be used for their listed intended purposes: as solvent traps or, with modification, as inline filters. The evidence further established that the items could be lawfully possessed for such purposes. Consequently, even when viewing the evidence in a light most favorable to the Government, none of the alleged silencers qualify as "firearms" or "silencers" under Chapter 18.[2]

---

[2] While none of the items at issue can qualify as "silencers" based on the plain text of 18 U.S.C. § 921(a)(25), that conclusion is particularly true of the filers that contained the cone style baffles. The evidence clearly established that those filers could not serve as silencers in their present forms. At most, those filters could be nothing more than "any part" that could allegedly be used to assemble or fabricate a silencer. 18 U.S.C. § 921(a)(25). As such, they could only potentially qualify as a "silencer" if they were "*intended only* for use in such assembly or fabrication." *Id.* In contrast, the Government expert alleged that the two filters with the monolithic cores could be used as silencers in their present form. Nonetheless, the fact remains that those filters were marketed for a purpose other than to muffle a firearm and were capable of serving as an oil/fuel filter capable of filtering large particles, just as Mr. Schieferle intended to use it. 18 U.S.C. § 921(a)(25).

**B. <u>The Government Failed to Prove that Mr. Schieferle Knew of the Features that Allegedly Might Qualify the Items as "Silencers"</u>**

In addition to failing to prove that the items at issue were silencers, the evidence failed to prove that Mr. Schieferle had knowledge of the alleged features that might purportedly qualify them as such. The Government attempted to paint a picture of Mr. Schieferle as some firearms expert by virtue of his employment history. The evidence did not, however, support such a conclusion by anything more than mere speculation. Serving as an air marshal and having prior military or law enforcement experience does confer specialized knowledge of firearms. Furthermore, with respect to the YouTube video, the forensic extraction did not establish that Mr. Schieferle ever watched that video. Just the same, with respect to the "Poor Man's James Bond," the Government simply cherry picked limited passages from an otherwise massive publication. It, moreover, did not establish that Mr. Schieferle reviewed the passages about silencers. Even assuming, however, that Mr. Schieferle had viewed the video and the relevant passages of the book, that evidence cannot impute the requisite knowledge and intent to possess unlawful silencers. Furthermore, for all the information obtained from the extractions, law enforcement found no evidence on the phone or laptop that Mr. Schieferle searched for silencers on Ali Express nor anywhere else. The fact remains that the evidence clearly established that the items at issue were marketed for and were capable of serving functions other than to muffle firearms. Mr. Schieferle, as the owner and

operator of a functioning farm, had a need for the legitimate purposes that the items at issue served. When viewed in its totality, the evidence simply did not prove that Mr. Schieferle had knowledge of the alleged features that purportedly could have allowed the items to alternatively be used as silencers.

As discussed at the outset of this Section, this Court addressed the knowledge requirement applicable to possession of an unlawful silencer in *Moore*, *supra*, 253 F.3d 607. This Court found in *Moore* that the Government carried its burden of proving that the defendant knew the requisite characteristics of a silencer he was charged with unlawfully possessing. In contrast to the instant case, however, the defendant stated to law enforcement that he knew the item he possessed was a silencer and recounted that he had purchased the silencer from a pawn shop. *Id.* at 608. In addition, an ATF agent testified that "steel wool packing protruded from the outside cylinder of the object" and that "when he looked down the end of the object he saw that there were holes drilled in the central cylinder." *Id.* at 610. This Court reasoned that a jury could "reasonably infer that one who possessed an object in that condition, with those features, would know that the object was a 'device for silencing, muffling, or diminishing the report of a portable firearm.'" *Id.* Notably, *Moore* does not indicate that any evidence was presented to establish that the alleged silencer had characteristics of any device other than a silencer. Moreover, the alleged silencer did not apparently have end caps that would block the hole drilled

down the central cylinder. Most critically, the facts at issue in *Moore* did not indicate that any additional steps would be needed to modify the item at issue to function as a silencer.

Given the facts at issue in *Moore*, the defendant seemingly could not have had knowledge that the alleged silencer was anything other than a silencer. Mr. Schieferle, on the other hand, purchased items that were marketed for purposes that he had a need for on his farm. All of those items had end-caps and had features of the solvent traps and/or inline filters that they were marketed as. Furthermore, with the apparent exception of all but two of the items at issue, the items would not have been operational as silencers in their present form. With respect to those items, the Government presented no evidence that Mr. Schieferle took any steps towards or had any intent to drill through those items to allow them to serve as silencers. Similarly, with respect to the boxed tube found in Mr. Schieferle's home, that item was not found anywhere near any firearms, but rather, was cluttered among other various items, many of which appeared to be farm related. Once again, given the totality of the evidence, the Government failed to carry its burden of proving the knowledge element required of all three of the charges alleged in this case.

**C. The Government Failed to Prove that Mr. Schieferle Knowingly Imported or Brought into the United States the Alleged Silencers**

As set forth above, the importation charges set out in Counts One and Two carried an element of knowingly importing or bringing into the United States and/or receiving any firearm or ammunition which has been imported or brought into the United States. 18 U.S.C. § 922(l).  The indictment, likewise, specifically charged that Mr. Schieferle "knowingly...imported and brought into the United States" the alleged silencer. Doc. 3 at 1-2.

While the Government presented evidence that Ali Express is a Chinese company, it presented no evidence that Mr. Schieferle knew or had reason to know that any goods purchased on the website would necessarily be imported from outside of the United States.  The mere fact that Ali Express is a Chinese company does not mean that any goods it sells will all be imported from outside the United States.  To be sure, the evidence established that Ali Express was an online marketplace that essentially brokered the retail sale of a plethora of assorted goods.  The website was repeatedly compared to Amazon.com.  Like Amazon, the Ali Express online marketplace operated internationally.

Though the items at issue in this case were imported into the United States, the Government's evidence did not establish that a person such as Mr. Schieferle who purchased such goods on the website would know that the goods would or would not cross international lines.  For all a retail purchaser such as Mr. Schieferle

could have known, the goods could be supplied by a manufacturer in the United States who merely used the Ali Express website to market its product. The evidence did not indicate that Mr. Schieferle was billed for international shipping nor that he was otherwise advised that the goods would be shipped internationally. Indeed, the evidence established that the page accessed on Ali Express advertised "free shipping." No other evidence indicates that Mr. Schieferle had knowledge that the items he ordered would be imported from outside the United States. Moreover, the box that contained the filter that was found in Mr. Schieferle's home had been mailed from New Jersey – within the United States. The evidence simply did not indicate that Mr. Schieferle would have known that the other filters he ordered would be shipped from an address outside of the United States. Therefore, in addition, to the error in failing to grant the judgment of acquittal as to all three counts, the district court further erred in denying the motion for judgment of acquittal on Counts One and Two based on the Government's failure to prove the element of "knowingly importing or bringing into the United States."

## II.

## THE DISTRICT COURT ADDITIONALLY ERRED AS A MATTER OF LAW IN DENYING MR. SCHIEFERLE'S MOTION TO SUPPRESS THE FRUITS OF THE SEARCH WARRANT.

The district court further erred in denying the motion to suppress evidence obtained as a result of the search of Mr. Schieferle's home.  Given the facts and circumstances set forth above, law enforcement's affidavit in support of the search warrant was far from sufficient to establish probable cause to support the issuance of a search warrant.  The affidavit relied on the mere fact that items that were legitimately purchased from an online retailer were addressed to Mr. Schieferle's residence.  The affidavit failed, however, to include pertinent facts that would have negated any purported probable cause, namely that the items in question could be used for legitimate purposes other than to silence a firearm and that the items could be lawfully converted to acts as silencers with ATF approval.  The affidavit, moreover, wholly failed to set out sufficient probable cause to believe the two smuggling-related offenses proposed in the search warrant application were committed or were being committed.  The affidavit was indeed so lacking in probable cause and so recklessly indifferent to the truth that the good faith exception could not apply to permit the Government's use of evidence obtained as a result of that deficient warrant.

### A. Law Enforcement's Affidavit Failed to Establish Probable Cause for the Issuance of a Search Warrant for Mr. Schieferle's Home

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). To establish probable cause, an affidavit submitted in support of a search warrant must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (quotation omitted). The totality of the circumstances should likewise "allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location" to be searched. *Brundidge*, 170 F.3d at 1352.

### 1. The Facts Alleged in the Affidavit did Not Support the District Court's Conclusion that the Affidavit Provided a Substantial Basis to Conclude that the Seized Items Were "Intended for Use in Assembling or Fabricating a Firearm Silencer"

The district court erroneously determined that the search warrant affidavit provided a substantial basis to conclude that the items being shipped to Mr. Schieferle were to be used to create a firearm silencer. First, the affidavit provided no more than pure speculation of such a conclusion. Second, and perhaps more importantly, the affidavit did not establish that possession of such items, even with purported intent to later use them to create a firearm silencer, was not unlawful and did not provide a lawful basis for the issuance of a search warrant.

The information before the issuing court did not include allegations that any of the alleged silencers were actual functioning silencers. On the contrary, the affidavit set out that the items at issue would need to be modified to serve as silencers, specifically by drilling a hole through the cap end. As the district court recognized, "the Warrant Application does not expressly identify facts to support a finding that Defendant intended to drill a hole through the capped end of the suppressors, so that they could function as such." Doc. 74 at 11. The issuing court was thereby only aware that Mr. Schieferle had allegedly ordered items on the internet that *might be able to be converted into silencers*.

That fact is particularly important given that an individual is able to obtain ATF approval to convert one of those items into a firearms silencer. While Mr. Schieferle had not obtained any such ATF approval, the affidavit still recognized that ATF Form 1, Application to Make and Register a Firearm, was available to a person such as Mr. Schieferle to seek approval to make and register a valid silencer. *See* Doc 74 at 12 *citing Form 1 – Application to Make and Register a Firearm (ATF Form 5320.1)*, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/firearms/docs/form/form-1-application-make-and-register-firearm-atf-form-53201/download (last revised December 2022). Consequently, any person such as Mr. Schieferle could possess items such as inline fuel filters and solvent traps, even with intent to later convert them to silencers, so long as the person

followed the proper legal channels to do so. It is, likewise, worth emphasizing that possession of a silencer is not illegal. In fact, as of 2021, 2,664,774 silencers were lawfully registered in the United States. U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update* (2021) (avail at: https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/ download).

The district court erroneously found, in denying the motion to suppress, that "[t]he Application, however, did not need to present evidence that Defendant intended to drill a hole in the products being shipped to his home; it needed to demonstrate probable cause that the products were being imported with the intent that someone would take that step so that they could function as a suppressor, and that evidence of the suspected crime would be found at Defendant's home." (Doc. 74 at 11.) The problem with the court's analysis is that, as set forth above, possessing products that could be used to create a silencer, even with intent to later fabricate them to serve as a silencer, is not illegal, particularly given that the ATF has procedures in place to permit such a person to lawful create a silencer.

The potential unlawful act that law enforcement appeared to be targeting was the possession or manufacture of unregistered silencers. Law enforcement, however, "jumped the gun" in the instant case because it sought a search warrant

37

based on an affidavit that relied on perfectly lawful activity. Had law enforcement conducted an investigation in the wake of the package seizures and found some evidence that Mr. Schieferle purportedly had or had intended to convert fuel filters into silencers without obtaining proper ATF approval, then probable cause may have existed to believe Mr. Schieferle was committing a crime. Based on the information contained in the four corners of the search warrant affidavit, on the other hand, law enforcement failed to provide probable cause to support the issuance of a search warrant. Furthermore, as discussed in Subsection B, law enforcement actually misled the issuing court to believe that Mr. Schieferle had committed some unlawful act in merely purchasing the fuel filters at issue.

Perhaps even more critically, the issuing court was not advised of the legitimate functions that the items at issue could serve other than to purportedly muffle firearms reports. In contrast, the Eighth Circuit, in *United States v. Hay*, 46 F.4th 746 (8th Cir. 2022), recently addressed the issuance of a search warrant under circumstances similar to those of the instant case. In *Hay*, U.S. Customs and Border Protection seized two packages in international mail that were listed as containing "Fuel Filters" and "Filters." *Id.* at 748-49. Inspections of the packages revealed them to contain items consistent with "NAPA 4003" fuel filters. *Id.* at 749. Law enforcement thereafter sought a search warrant for the address of the intended recipient of the packages. *Id.* When, however, law enforcement sought the search

warrant, it relied on bulletins of the ATF Firearms Technology Criminal Branch (FTCB) that alleged that the items at issue qualified as "silencers" *in their present forms*. *Id.* at 748 (emphasis added). The bulletin was described, in part, as:

> On October 30, 2019, the FTCB released Technical Bulletin 20-01 (the Bulletin) "to clarify the classification of solvent traps and inline filters purportedly used as solvent traps," and the Bulletin's findings are included in the affidavit. According to Husak, the Bulletin explains that "legitimate solvent traps ... attach to the muzzle of a firearm and are designed to catch or 'trap' dirty cleaning solvent discharged from the barrel of a firearm when cleaning." In order to function, such solvent traps must have solid front end-caps with "no hole that [would] allow a projectile to pass-through." Purported solvent traps "that have a hole in or indexing mark for a hole in the front end-cap," on the other hand, "are classified as a 'firearm silencer' under the [NFA]."

> Additionally, "[t]he size of threading on legitimate fuel filters is inconsistent with the size of firearm muzzle threading." However, many items sold online as "fuel filters" or "inline fuel filters" contain end caps with "threads the same size as firearm barrels, [which] negates the need for adaptors or modification" before they can be used as silencers. The affidavit explains that "[t]he FTCB classified such filters as 'firearm silencers.'"

> Finally, the affidavit discusses a particular type of "fuel filter," often marketed as the "NAPA 4003" fuel filter, that also has "no actual filtering capability." "NAPA 4003" fuel filters are sized to fit a firearm muzzle without an adaptor and have an end cap with "pre-drilled center markings (indexing markings) that are not drilled completely through," and a front cap with "a fully pre-drilled hole that is threaded to accept firearm muzzles." They also contain a "spacer ... to create a 'blast chamber' at the end of the device, a known feature of commercial silencers." These filters are classified by the FTCB as firearm silencers.

*Id.* After a search warrant was later issued and the defendant was arrested based on evidence seized under the warrant, the defendant filed a motion to suppress. *Id.* The

39

motion asserted, among other grounds, that "the Bulletin on which the affidavit relied amounted to an illegal and secret change of law that altered the legal status of fuel filters and solvent traps." *Id.* The Eighth Circuit went on to affirm the denial of the motion to suppress on appeal given the facts of that case. *Id.* at 751.

The issue before the Eighth Circuit in *Hay* was different from the issue before this Court. The significance of *Hay*, however, is the distinction between the information that law enforcement presented to the issuing court in that case in comparison to the information presented to the issuing court in the instant case. The issuing court in *Hay* was apprised, whether correctly or not, that the items seized by Customs qualified as silencers in their present form. In sharp contrast, the issuing court was informed in the instant case that the seized items would need to be modified to serve as silencers. Furthermore, even though law enforcement recognized and included that significant caveat in the affidavit, it failed to further allege that the items can serve legitimate functions other than to acts as silencers. Therefore, in sharp contrast to the situation at issue in *Hay*, the reviewing court was not fully advised that the fuel filters and solvent traps were not unlawful in their present forms. Just the same, the affidavit entirely failed to provide any cause to believe that Mr. Schieferle intended to take the steps of modifying the filters to serve as silencers and that he intended to do so without first gaining ATF approval.

In the end, it simply is not a crime to purchase and possess fuel filters, solvent traps, or other items that might be convertible into a firearm silencer.   The lower court essentially missed the mark in denying the motion to suppress.   The lower court failed to recognize and address the legal significance of the affidavit's failure to advise of 1) the legitimate functions that can be carried out by the items at issue and 2) the fact that a person could legally convert a fuel filter or solvent tube to be a silencer with proper ATF approval.   Given the allegations set out in the four corners of the affidavit, the search warrant failed to provide probable cause to support the issuance of a search warrant.

2. Notwithstanding the Foregoing, the Search Warrant Failed to Establish Probable Cause for the Proposed Offenses Alleged in the Search Warrant Application

As set forth above, the application for the search warrant alleged the commission of offenses different from those that Mr. Schieferle was charged with. The application alleged offenses of Smuggling Goods into the United States and Receipt or Possession of an Unlawfully Imported Firearm.  Notwithstanding the fact that the search warrant affidavit did not provide probable cause to be evidence of *any* crime would be found, it certainly failed to provide probable cause for those two specified offenses.

18 U.S.C. § 545, which proscribes the offense of Smuggling Goods into the United States, states in relevant part:

Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces or attempts to smuggle or clandestinely introduce into the United States any merchandise which should have been invoiced, or makes out or passes, or attempts to pass, through the customhouse any false, forged, or fraudulent invoice, or other document or paper; or

Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law—

18 U.S.C § 545.

As to the offense of Possession of an Unlawfully Imported Firearm, 26 U.S.C.

§ 5844, provides various guidelines concerning the importation of firearms:

No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction unless the importer establishes, under regulations as may be prescribed by the Secretary, that the firearm to be imported or brought in is—

(1) being imported or brought in for the use of the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof; or
(2) being imported or brought in for scientific or research purposes; or
(3) being imported or brought in solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer;

except that, the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with classifying the firearm.

26 U.S.C. § 5844.  Section 5861(k), in turn, criminalizes the receipt or possession of

a firearm which has been imported or brought" into the United States in violation of

section 5844." 26 U.S.C. §5861(k).  Section 5871 then sets out penalties for such offenses. 26 U.S.C. §5871.

Both of the proposed offenses necessarily involve the unlawful importation of of goods.  With respect to the Possession of an Unlawfully Imported Firearm, that offense specifically contemplates an unlawfully imported firearm.  Once again, as set forth above, the affidavit explicitly set out that the items in question needed to be modified to function as a firearm silencer.  The items, furthermore, were purchased from a legitimate retailer.  While the Government alleged at trial that two of the items at issue were functional as silencers in their then-present form, it made no such allegation in the search warrant affidavit.  The affidavit merely set out that the items *could* be modified to serve as silencers and that they could potentially even be done so legally.  As a result, the affidavit could not sufficiently establish that the items inspected at the airport were firearms or any other such contraband that would be subject to 18 U.S.C § 545 or 26 U.S.C. §§ 5844, 5861(k), and 5871.

Aside from the foregoing, the affidavit further failed to establish that the items were unlawfully imported.  As the district court recognized, ATF Form 1, which the affidavit referenced and which is discussed above, is an Application to Make and Register a Firearm. *See* Doc 74 at 12; *see also See Form 1 – Application to Make and Register a Firearm (ATF Form 5320.1)*, Bureau of Alcohol, Tobacco, Firearms and Explosives, https://www.atf.gov/firearms/docs/form/form-1-application-make-

43

and-register-firearm-atf-form-53201/download (last revised December 2022).  That form was relevant to the question of whether a person could lawfully intend to convert a fuel filter to a silencer.  An altogether different form, ATF Form 6, is used to seek authorization to import firearms into the United States.  As the district court recognized, the affidavit made no reference to Form 6.  It likewise failed to establish how or why the importation of the items constituted smuggling or was otherwise illegal in itself.

For those reasons, the search warrant affidavit was insufficient to provide probable cause to believe evidence would exist of the two offenses that law enforcement chose to propose in its search warrant application.  Indeed, the lower court even recognized that the purported cause shown in the warrant affidavit was marginal.  Despite that, the court seemingly erred on the side of upholding the warrant.  For the reasons set forth above, however, the court erred in so holding because the warrant was insufficient to show probable cause to believe any crime was committed or being committed, much less the specific importation-related offenses proposed in the search warrant application.

**B. The Good Faith Exception did not Apply Because the Affidavit Misled the Magistrate Judge and Omitted Critical Facts that Would Have Negated the Existence of Probable Cause**

In addition to the error in finding that probable cause existed for the issuance of a search warrant, the district court further erred in finding that the good faith exception would save the fruits of the unlawful search warrant. Under the good faith exception to the exclusionary rule, even when a search warrant is found to be invalid, evidence obtained in good faith, reasonable reliance on the defective search warrant may still be admissible. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The Supreme Court held in *Leon* that the Government would not be barred from using evidence that was obtained from a faulty search warrant "by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Id.* at 900, 905 (emphasis added). The Government bears the burden of proving the applicability of the good faith exception. *United States v. McGough*, 412 F.3d 1232, 1239 (11th Cir. 2005). This Court has recognized that four exceptions exist to the *Leon* good faith exception:

> (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;"
> (2) "where the issuing magistrate wholly abandoned" his detached and neutral judicial role;
> (3) where the affidavit supporting the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

(4) where, depending upon the circumstances of the particular case, a warrant is "so facially deficient - *i.e.*, in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid."

*United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002) *quoting Leon*, 468 U.S. at 923.

In the instant case, the affidavit submitted in support of the search warrant clearly misled the issuing court and included information that the affiant knew or should have known was untrue. As set forth above, the affidavit wholly failed to inform the issuing court that solvent traps and inline fuel filters can serve legitimate purposes other than to silence firearms. It likewise failed to inform the court that such items may be lawfully possessed for such purposes. The Government's witnesses established at trial that law enforcement was aware of those facts despite its beliefs as to Mr. Schieferle's intent. Moreover, while the affidavit referenced ATF Form 1 and alleged that Mr. Schieferle did not follow the procedures for creating a firearms silencer, it led the issuing court to believe that mere possession of solvent traps or inline fuel filters was unlawful if the person in possession had intent to convert them to act as silencers. In reality, as set forth above, a person could possess such items, even with intent to modify them to serve as silencers, so long as they followed the proper procedures to do so. The affidavit left the issuing court blind to the fact that someone could possess the items at issue for non-firearms related purposes *or* prior to seeking permission to convert them to act as a silencer.

Based on the information that was omitted from and misrepresented in the affidavit, the affiant misled the issuing court with an affidavit that he knew was false and was made in reckless disregard of the truth. The lower court, in turn, erred in declining to conduct a *Franks* hearing as Mr. Schieferle requested. Furthermore, when considered in the context of the offenses proposed in the search warrant application, the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Martin*, 297 F.3d at 1313. Consequently, the existence of probable cause was not, as the district court reasoned, even a marginal call. Under the totality of the circumstances, no reasonable law enforcement officer could rely in good faith on a warrant issued pursuant to that affidavit.

For all of the reasons set forth above, the district court erred in denying Mr. Schieferle's motion to suppress the fruits of the search of his home. Therefore, should the Court decline to remand with instructions to enter a judgement of acquittal based on the preceding issue, Mr. Schieferle would respectfully request the Court to vacate the judgment and remand this case with instructions to order a new trial.

47

## III.

## THE SECOND AMENDMENT PROTECTS THE RIGHT TO POSSESS FIREARMS FOR SELF-DEFENSE IN AND OUTSIDE OF AN INDIVIDUAL'S HOME

Even assuming for purposes of argument that Mr. Schieferle knowingly and intentionally possessed silencers, the Supreme Court held in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ---, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022), that the Second Amendment protects an individual's right to carry a firearm for self-defense outside of his or her home. *Id.* The *Bruen* opinion extended from *District of Columbia v. Heller*, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), in which the Court held that the Second and Fourteenth Amendments protect the right of a citizen to possess a handgun in his or her home for self-defense.

The Court held in *Bruen* that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2129-30. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment[ ]." *Id.* at 2130.

In so holding, the Supreme Court rejected the means end scrutiny analysis that lower courts' had employed since *Heller*. Id. at 2125. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that

delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Conducting that historical tradition review requires courts to "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. That is because, as the Court provides, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (*quoting Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783) (emphasis in original)

The Court further provided "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. The Court cautioned that reviewing courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 & n.28; *see also Dobbs v. Jackson Women's Health Org.*, 597 U.S. ---, 142 S. Ct. 2228, 2267, 213 L.Ed.2d 545 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

Consistent with *Bruen*, the Second Amendment's plain text protects the right of an individual to possess arms such as the silencers covered under the National Firearms Act. The Second Amendment holds "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed." A question pertinent to the instant issue is whether a silencer is an "arm" as contemplated in the Second Amendment. The Court's analysis in *Bruen* indicates that the silencer is such an "arm."

To illustrate, the Court provided in *Bruen* "[w]e have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.'" *Bruen*, 142 S.Ct. at 2132 *quoting Heller*, 554 U.S. at 582, 128 S.Ct. 2783. "'Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Id. quoting id* (citations omitted in original). The Court went on to hold that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id citing Caetano v. Massachusetts*, 577 U.S. 411, 411–412, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016) (per curiam) (addressing stun guns).

The Court thereby made clear that the question of whether an object constitutes an "arm" turns on its purpose in facilitating armed self-defense. A silencer undoubtedly serves to facilitate armed self-defense. *Compare United States*

50

*v. Saleem*, --- F.Supp.3d ----, 2023 WL 2334417 (W.D. N.C. Mar. 2, 2023) (finding that a silencer is not an arm after focusing on the mechanism of a silencer rather than on its function in facilitating self-defense).  Congress, moreover, certainly views a silencer as serving such a purpose because, as set forth in Issue I, it included "firearm muffler" and "firearm silencer" within the definition of a "firearm." 18 U.S.C. § 921(a)(3).  Consistent with Congress' intent, under the historical understanding of the term "arms" as used in the Second Amendment, a silencer would have qualified as such an "arm."  Consequently, the Second Amendment covers the possession of silencers.

Turning to the historical tradition of protecting the right to bear arms such as silencers, the regulation of personal use arms such as silencers is not consistent with the Nation's historical tradition of firearm regulation.  To be sure, in this context, the name "silencer" is largely misleading as such items do not completely silence, but rather, muffle the report of a firearm.  While silencers may not have existed in their present form at the time of the Nation's founding, they do have long history of legitimate use in the United States.  The first patent for a silencer appears to have been issued in 1894. J. Stahel, Device for Lessening the Notice of Firearms, No. 516,236, Patented Mar. 13, 1894.   Silencers then became readily available commercially in 1902. Emily Rupertus, Suppressors: The History, NRA BLOG, https://www.nrablog.com/articles/2016/10/history-of-suppressors/ (Oct. 5, 2016).

The silencers were "marketed to all sportsmen and intended to enhance the shooting experience by reducing the risk of hearing damage and noise pollution." *Id* Theodore Roosevelt apparently was a proponent of and regular user of silencers. *Id. see also Saleem*, 2023 WL 2334417 at *10 n.7 quoting *id.*    When the National Firearms Act was later implemented in 1934, it imposed the same $200 tax for the creation of a silencer that exists today. *Id*; *see also supra* Issue II.    Moving to the present, as of 2021, and as discussed above, 2,664,774 lawfully registered silencers existed in the United States. U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States: Annual Statistical Update* (2021) (avail at: https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download).

As history demonstrates, the silencer is a useful arm that would have been protected under the Second Amendment.    To be sure, the device has seemingly received a bad name in movies and other media.    History and the widespread lawful ownership of the devices indicate, on the other hand, that, in reality, "silencers" are a genuine modern instrument that facilitates armed self-defense.    As a result, the Second Amendment covers the alleged conduct that was prosecuted in the instant case.    The statutes proscribing the offenses charged against Mr. Schieferle, 18 U.S.C. §§ 922(l), 924(a)(1)(C) and 26 U.S.C. §  5861(d), are thereby unconstitutional as applied in the instant case.

## **CONCLUSION**

Based on the foregoing, Appellant David Schieferle respectfully requests that this Honorable Court reverse the judgment and sentences imposed in this cause and remand the case to the district court with instructions to enter a judgment of acquittal or, in the alternative, with instructions to conduct a new trial.

Respectfully Submitted,

s/ *J. Jervis Wise*
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

The undersigned certifies, pursuant to 11th Circuit Rule 28-1, that this Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure because it contains 12,842 words, excluding the parts exempted by subsection 32(a)(7)(B)(iii).  Microsoft Word software was used to count the words in the foregoing Brief.  This Brief, likewise, complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman font.

s/ <i>J. Jervis Wise</i>
J. JERVIS WISE, ESQ.
BRUNVAND WISE, P.A.
615 Turner Street
Clearwater, FL 33756
Telephone:  727-446-7505
Facsimile:  727-446-8147
E-Mail: jervis@acquitter.com
Florida Bar # 0019181
Counsel for Appellant

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed

using the CM/ECF system, which will send a notice of electronic filing to all counsel

of record, on October 11, 2023.

> s/ *J. Jervis Wise*
> J. JERVIS WISE, ESQ.
> BRUNVAND WISE, P.A.
> 615 Turner Street
> Clearwater, FL 33756
> Telephone:  727-446-7505
> Facsimile:  727-446-8147
> E-Mail: jervis@acquitter.com
> Florida Bar # 0019181
> Counsel for Appellant

I FURTHER CERTIFY that four hard copies of the foregoing brief are being

furnished to the Clerk of this Court by mail.

> s/ *J. Jervis Wise*
> J. JERVIS WISE, ESQ.
> BRUNVAND WISE, P.A.
> 615 Turner Street
> Clearwater, FL 33756
> Telephone:  727-446-7505
> Facsimile:  727-446-8147
> E-Mail: jervis@acquitter.com
> Florida Bar # 0019181
> Counsel for Appellant