IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **23-11792-J**

United States of America,

Appellee,

- versus -

David Schieferle,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

BRIEF FOR THE UNITED STATES

<div style="margin-left:40%;">

Markenzy Lapointe
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9226

</div>

Daniel Matzkin
Chief, Appellate Division

Jason Wu
Assistant United States Attorney

Of Counsel

## United States v. David Schieferle, Case No. 23-11792-J
## Certificate of Interested Persons

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list set forth below is a complete list of the persons and entities previously included in the CIP included in the appellant's initial brief, and also includes additional persons and entities (designated in bold face) who have an interest in the outcome of this case and were omitted from the appellant's CIP.

Buschel, Robert C.

Demanovich, Stephen J.

Gonzalez, Juan Antonio

Haguel, Steven H.

Klepach, Arielle

Lapointe, Markenzy

Louis, Hon. Lauren Fleischer

Matzkin, Daniel

McAliley, Hon. Chris M.

Otazo-Reyes, Hon, Alicia

Sanchez, Hon. Eduardo I.

Schieferle, David

**United States v. David Schieferle, Case No. 23-11792-J**

**Certificate of Interested Persons (Continued)**

Silverstein, Joan

Stone, Emily R.

Williams, Hon. Kathleen M.

Wise, Jason Jervis

**Wu, Jason**

s/ *Jason Wu*
Jason Wu
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States of America respectfully suggests that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument.

# Table of Contents

**Page:**

Certificate of Interested Persons .................................................. c-1

Statement Regarding Oral Argument ............................................. i

Table of Contents ...................................................................... ii

Table of Citations ...................................................................... v

Statement of Jurisdiction ........................................................... xii

Statement of the Issues .............................................................. 1

Statement of the Case:

    1.    Course of Proceedings and Disposition in the Court Below ........ 2

    2.    Statement of the Facts ................................................. 2

    3.    Standards of Review ................................................... 10

Summary of the Argument ......................................................... 11

**Table of Contents**

**(Continued)**

**Page:**

Argument

I.    There Was Sufficient Evidence that Schieferle Possessed and
Imported Silencers, and that He Knew of the Features that Made
Each Kit a Silencer. ........................................................................ 13

   A.    All Thirteen Devices Were Silencers Because They Had
Distinctive Features Only Useful for Suppressing the Sound of
a Gunshot .................................................................................... 14

   B.    Schieferle Knew of the Features that Made These Items
Silencers ...................................................................................... 19

   C.    Under Plain-Error Review, the Government Proved that
Schieferle Knew the Silencers from Counts 1 and 2 Came From
Outside the United States .......................................................... 23

II.    The District Court Did Not Err by Declining To Suppress Evidence
Found During a Warrant-Authorized Search of Schieferle's House ... 24

   A.    Background ................................................................................. 24

   B.    Schieferle's Two Shipments of Illegal Silencers Gave Rise to
Probable Cause Supporting the Search Warrant for His House ... 31

   C.    The Good-Faith Exception Applies Because Law Enforcement
Reasonably Relied on This Warrant ........................................... 37

**Table of Contents**

**(Continued)**

**Page:**

III.   Schieferle's Statutes of Conviction Are Not Plainly Unconstitutional

Under the Second Amendment........................................................... 41

A.   Under Plain-Error Review, Schieferle Cannot Show that 18 U.S.C.

§ 922(l) or 26 U.S.C. § 5861(d) Are Unconstitutional ................... 41

B.   Silencers Are Not Arms Commonly Used by Law-Abiding Citizens

for Lawful Purposes and Thus Fall Outside the Scope of the Second

Amendment................................................................................. 43

Conclusion  ............................................................................................. 50

Certificate of Compliance.......................................................................... 51

Certificate of Service  ............................................................................... 52

## Table of Citations

**Cases:**                                                                    **Page:**

*Ali v. Fed. Bureau of Prisons*,

   552 U.S. 214 (2008) ................................................................. 17

*Cox v. United States*,

   2023 WL 4203261 (D. Alaska June 27, 2023) ........................................... 45

*Davis v. United States*,

   564 U.S. 229 (2011) ................................................................. 37

*Dist. of Columbia v. Heller*,

   554 U.S. 570 (2008) ..................................................... 42, *passim*

*District of Columbia v. Wesby*,

   583 U.S. 48 (2018) ................................................................... 31

*Franks v. Delaware*,

   438 U.S. 154 (1978) ..................................................... 27, *passim*

*Fyock v. Sunnyvale*,

   779 F.3d 991 (9th Cir. 2015) ...................................................... 43

*Illinois v. Gates*,

   462 U.S. 213 (1983) ..................................................... 29, *passim*

*Maryland v. Pringle*,

   540 U.S. 366 (2003) ................................................................. 31

# Table of Citations

## (Continued)

**Cases:**                                                                **Page:**

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*

  142 S. Ct. 2111 (2022)................................................................... 42

*Staples v. United States,*

  511 U.S. 600 (1994) ....................................................... 17, 19, 20

*State v. Langford,*

  3 Hawks 381 (N.C. 1824)........................................................... 47

*Teixeira v. Cnty. of Alameda,*

  873 F.3d 670 (9th Cir. 2017) ................................................48, 49

*United States v. Arbolaez,*

  450 F.3d 1283 (11th Cir. 2006).................................................. 39

*United States v. Benjamin,*

  958 F.3d 1124 (11th Cir. 2020).................................................. 22

*United States v. Bolatete,*

  977 F.3d 1022 (11th Cir. 2020).......................................1, *passim*

*United States v. Caldwell,*

  81 F.4th 1160 (11th Cir. 2023).................................................. 22

# Table of Citations

## (Continued)

**Cases:** **Page:**

*United States v. Caniff,*

  955 F.3d 1183 (11th Cir. 2020) ..................................................... 17

*United States v. Capers,*

  708 F.3d 1286 (11th Cir. 2013) ..............................................11, 22

*United States v. Cooperman,*

  2023 WL 4762710 (N.D. Ill. July 23, 2023) ............................... 45

*United States v. Cox,*

  906 F.3d 1170 (10th Cir. 2018) .................................................... 44

*United States v. Crooker,*

  608 F.3d 94 (1st Cir. 2010) .......................................................... 18

*United States v. Downs,*

  61 F.4th 1306 (11th Cir. 2023) ...............................................11, 23

*United States v. Evans,*

  958 F.3d 1102 (11th Cir. 2020) .................................................... 11

*United States v. Hay,*

  46 F.4th 746 (8th Cir. 2022) .................................................36, 37

**Table of Citations**

**(Continued)**

<u>Cases:</u> <u>Page:</u>

*United States v. Hurley*,

   755 F.2d 788 (11th Cir. 1985)....................................................... 34

*United States v. Knights,*

   534 U.S. 112 (2001) ...................................................................... 37

*United States v. Leon*,

   468 U.S. 897 (1984) .......................................................... 29, 37, 38

*United States v. Martin*,

   297 F.3d 1308 (11th Cir. 2002)..................................................... 37

*United States v. McCartney*,

   357 F. App'x 73 (9th Cir. 2009).................................................... 47

*United States v. Miller*,

   307 U.S. 174 (1939) ...................................................................... 45

*United States v. Moon*,

   33 F.4th 1284 (11th Cir. 2022).................................................39, 40

*United States v. Moore*,

   253 F.3d 607 (11th Cir. 2001)....................................................... 22

# Table of Citations

## (Continued)

**Cases:**                                                           **Page:**

*United States v. Morales*,

   987 F.3d 966 (11th Cir. 2021)...............................................................38, 40

*United States v. Olano*,

   507 U.S. 725 (1993) ................................................................................. 11

*United States v. Peterson*,

   2023 WL 5383664 (E.D. La. Aug. 21, 2023) ............................................ 45

*United States v. Royce*,

   2023 WL 2163677 (D.N.D. Feb. 22, 2023) ............................................... 45

*United States v. Saleem*,

   --- F. Supp. 3d ----, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)................ 45

*United States v. Tagg*,

   572 F.3d 1320 (11th Cir. 2009).................................................................. 47

*United States v. Vereen*,

   920 F.3d 1300 (11th Cir. 2019)................................................................. 41

*United States v. Villalobos*,

   2023 WL 3044770 (D. Idaho Apr. 21, 2023) ............................................ 45

## Table of Citations

## (Continued)

**Cases:**                                                                                      **Page:**

*United States v. Williams*,

    459 F.2d 909 (6th Cir. 1972) ........................................................................ 34

**Statutes & Other Authorities:**

18 U.S.C. § 545 ................................................................................................24, 35

18 U.S.C. § 921 ............................................................................................ 14, *passim*

18 U.S.C. § 922 .............................................................................................2, *passim*

18 U.S.C. § 924 ...............................................................................................16, 34

18 U.S.C. § 925 ...................................................................................................... 14

18 U.S.C. § 3231 ..................................................................................................... xii

26 U.S.C. Ch. 53 ..................................................................................................... 48

26 U.S.C. § 5844 ........................................................................................... 24, 35, 36

26 U.S.C. § 5845 .................................................................................................... 14

26 U.S.C. § 5861 ............................................................................................2, *passim*

26 U.S.C. § 5871 ........................................................................................... 24, 35, 36

28 U.S.C. § 1291 ..................................................................................................... xii

Fed. R. App. P. 4 ................................................................................................... xii

Fed. R. App. P. 26.1 .............................................................................................. c-1

# Table of Citations

## (Continued)

**Statutes & Other Authorities:**                                    **Page:**

Fed. R. App. P. 32 ....................................................................... 51

27 C.F.R. § 447.52 ...................................................................... 26


**Other Authorities:**

Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*,
   83 Law & Contemp. Probs. 231 (2020) ...................................................... 47

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*,
   80 Law & Contemp. Probs. 55 (2017) ..................................................48, 49

## Statement of Jurisdiction

This is an appeal from a final judgment of the United States District Court for the Southern District of Florida in a criminal case. The district court entered its judgment against David Schieferle on May 24, 2023 (DE146). The district court had jurisdiction to enter the judgment pursuant to 18 U.S.C. § 3231. Schieferle filed a timely notice of appeal one day later (DE147); *see* Fed. R. App. P. 4(b). This Court has jurisdiction over Schieferle's appeal pursuant to 28 U.S.C. § 1291.

## Introduction

David Schieferle would not be in this position if he had listened to some good advice he received from, of all places, the Internet. In 2020, Schieferle, an avid gun enthusiast, began looking for ways to buy or make cheap silencers. His searches led him to a manual called Poor Man's James Bond, which explained how to create homemade silencers. That guide also warned, however, that "possess[ing] such an item . . . is illegal" and that "if you are caught [with] one, it will almost certainly get you a lengthy stay in a Federal prison." Undeterred, Schieferle ordered a dozen silencer kits from a Chinese e-commerce platform. And Poor Man's James Bond's prediction panned out. The authorities discovered Schieferle's illegal silencers in the mail, and another during a search of his house, and Schieferle is now serving an eight-month prison term.

The major theme of Schieferle's arguments is that these illegal kits were innocuous fuel filters or solvent traps. But the kits contained all the pieces needed to make a silencer. Two of them worked as silencers right out of the box. As for the others, the only step needed to complete the design was to drill through the central pilot dimples in the pieces—a task conceptually similar to (and about as difficult as) punching a hole in a juice box to drink it. Thus, this Court should affirm Schieferle's convictions.

## Statement of the Issues

I.      It is illegal to knowingly possess or import an unregistered combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer. Schieferle ordered two devices that worked as silencers out of the box and other kits that needed one small step—drilling a hole through the included parts—to complete the design. Given these facts, was there sufficient evidence to find Schieferle guilty of importing and possessing illegal silencers?

II.     Officers intercepted two packages, addressed to Schieferle, which contained twelve suspected silencers. Law enforcement then obtained a search warrant for Schieferle's residence based on those seizures and the fact that he had no license to import silencers. Did these facts give rise to sufficient probable cause to justify the search warrant? And even if they did not, does the good-faith exception to the exclusionary rule apply?

III.    For the first time on appeal, Schieferle claims that the Second Amendment protects the right to possess and import silencers. This Court recently rejected a similar plain-error challenge in *United States v. Bolatete*, 977 F.3d 1022 (11th Cir. 2020). Under plain-error review, were his convictions unconstitutional?

## Statement of the Case

### 1.    Course of Proceedings and Disposition in the Court Below

In March 2022, a Southern District of Florida grand jury indicted David Schieferle for three gun-related crimes (DE3). The indictment alleged that Schieferle illegally imported silencers on two dates in December 2020, which violated 18 U.S.C. § 922(l) (Counts 1 and 2) (DE3:1-2). It also alleged that, a week later, he possessed an unregistered silencer found in his home, which violated 26 U.S.C. § 5861(d) (Count 3) (DE3:2).

Schieferle moved to suppress the evidence obtained from the search of his house (DE36). Based on the magistrate judge's recommendation, the district court denied Schieferle's motion (DE74; DE89). Part II.A of the Argument describes this history in more detail.

After a four-day trial, a jury found Schieferle guilty on all three counts (DE104). In May 2023, the district court sentenced Schieferle to eight months in prison and three years' supervised release (DE146).

This timely expedited appeal followed (DE147).

### 2.    Statement of the Facts

During the 2020 holiday season, Customs and Border Protection officers flagged a package coming from China (DE162:15-16). The intended recipient

was David Schieferle, and the package contained ten suspected silencers (DE162:23; GX1A-GX1J). This package was the basis for Count 1.

The shipment claimed that its contents were "solvent," but there was no solvent inside (DE162:19-20). In their experience, Customs officers often found illegal suppressors labeled as "solvent trap[s]" (DE162:20). These silencers came in two styles: either "the cone style where there are little [pieces] that stack on top of each other" or "the outer metal tube with an inner chamber" (DE162:15). Schieferle's package contained both types. Eight of the devices looked like this:



(GX1A).

The other two were larger and had a different design:



(GX1J).

About ten days later, Customs officers stopped another package from China, also destined for Schieferle (DE162:29-30). This one's label claimed that it contained "adapters" (DE162:29). Inside, the officers found two more suspected silencers (DE162:27-28, 47-48; GX2A; GX2B). This shipment formed the basis for Count 2.

After intercepting these packages, law enforcement obtained and executed a search warrant at Schieferle's house (DE162:60). Inside the house, officers

found many pistols, rifles (including AR-15 rifles), and shotguns (DE162:60-65). They also found "another firearm silencer," a "black . . . hollow tube with two end-caps, one of which was internally threaded and one with a marking in the center" (DE162:74-75; GX9). The agent who found the silencer remarked that it "looked nearly identical to the one [he was] issued" with his government firearm (DE162:94). This item was the basis for Count 3.

To import a silencer, a person must apply for an import license, pass a background check, and pay a $200 tax per item (DE162:44). None of the thirteen silencers had serial numbers, and Schieferle did not have a license to import silencers into the United States (DE162:40, 43-44, 49, 85; DE163:99-100). Nor did he register his silencers with the National Firearms Registration and Transfer Record, as the law required (DE162:85; DE163:90, 99-100).

A firearms expert examined all thirteen devices and confirmed that they were silencers (DE163:51, 62-64). A silencer works by slowing and cooling down the gas created by a gunpowder explosion (DE163:43-44). To achieve this purpose, silencers typically have three parts: "an outer tube," an "end-cap[]" that threads onto a gun barrel, and an "expansion chamber" inside the tube "that helps in reducing the sound of a firearm when shot" (DE163:42, 45, 48).

Most expansion chambers feature "a baffle," "a series of partitions that separate the inside of a firearm silencer to allow more gas to expand outward as

the bullet is going down the center of the device" (DE163:45). Two common styles are "cone type design baffle[s]," which divide the interior of the silencer into different chambers, and "monolithic" or monocore baffles, which consist of a single piece of metal divided into segments (DE163:48-50).

Turning to the disputed items, the expert confirmed that GX1A was a silencer (DE163:52). It had a metal outer tube and a rear end cap designed to attach to a gun barrel (*id.*). It also had "seven cone type baffles" with a "center indexing mark" in each one, to "assist in drilling" (DE163:53). There was no reason to have these pilot holes "other than to mark where a drill should pass" (DE163:54). The design also included "a spacer or a blast chamber," the initial part of the tube that "would act as the initial expansion chamber" (*id.*). Finally, the front end cap also bore "a centered indexing mark for assisting in drilling" (*id.*). Seven other silencers from that shipment had a "near identical" design (DE163:55; GX1B-GX1H).

Exhibits GX1I and GX1J, in contrast, worked as silencers right out of the box (DE163:56-58). Those devices already had a hollow passage drilled through their monocore baffles, so they were complete when assembled (DE163:57). "[N]o drilling or modification was required" (DE163:58). When the expert tested one of these devices, it reduced the sound of a gunshot by 17 decibels (*id.*). In practical terms, a person would normally wear hearing protection when firing

a gun. "[W]ith this firearm silencer installed," the expert could "take [his] hearing protection off and . . . fire . . . with no fear of hurting [his] ears" (DE163:58-59).

For similar reasons, the expert concluded that the two kits from the second December 2020 shipment and the final device found in Schieferle's home were all silencers (DE163:62-64). Based on their threading, the recovered silencers fit onto AR-15 rifles like the ones Schieferle kept in his home (DE163:60, 64-65).

Schieferle's phone and computer records further confirmed that he planned to use these devices as silencers. Schieferle's search history included a Youtube video called "The Cheapest Suppressor," which explained how baffles suppress a gunshot (DE162:117; GX12). He viewed that video in November 2020, before he bought these silencer kits (GX162:117; GX11).

Schieferle also had a manual called Poor Man's James Bond, which discussed how to make illegal silencers (DE162:122-23; GX18; GX19). One article, titled "Silencers from the Home Workshop," observed that silencers are "good for just two things" (GX18:2). "First of all, if you are caught in possession of one, it will almost certainly get you a lengthy stay in a Federal prison" (*id.*).

"The only other thing a silencer is actually suited for is to kill someone at a distance without making a lot of noise"; they "do not have any practical use as a hunting or target weapon" (*id.*). Thus, these devices hold "considerable

appeal" for "pseudo gangsters" who "desire to possess such an item simply because it is illegal" (*id.*). To drive the point home, the author warned: "don't, for Heaven's sake, tell me that you are building one of these guns and ask me to help you. If I did, it is possible, and probable, that I (and you) could be charged with conspiring to violate the Federal Firearms Laws" (GX18:3).

After getting those legal niceties out of the way, the article described how to make a silencer (GX18:3-16). Most silencer designs were "simply a series of sleeves, baffles, and absorbent materials enclosed in a tube with an opening for the barrel at one end and an exit hole for the bullet at the other" (GX18:3). The diagrams bore a striking resemblance to the items that Schieferle bought:



(GX18:4).

8

The author ended on a cautionary note: "[U]nless you plan to assassinate someone, you very probably don't have any business" owning these items (GX18:16). "The Federal Government has a number of penitentiaries scattered around the country just waiting for people that they catch with something like what is described in this book. Don't let them catch you" (*id.*).

Other files included a diagram explaining how to put together the components of a cone-baffle silencer (GX35B), and an Amazon page putting a price alert on titanium drill bits—which Schieferle would need to build his silencers (GX36).

The electronic evidence also showed that Schieferle ordered the two intercepted shipments. In November 2020, he searched a Chinese e-commerce platform, Ali Express, for "solvent traps" (DE162:120-21; GX14). And on his phone's Ali Express application, his recent orders included the seized silencer kits (DE162:73; GX26; GX27; GX28; GX29). One order, for instance, was for two 10-inch "solvent traps," with an illustration of the item showcasing its monocore baffle (GX26). Fulfilling his goal of finding the cheapest suppressor, Schieferle bought these kits for around $25 per device, while legal silencers cost between $200 and $1,000 (DE162:44; DE163:80).

In his defense, Schieferle insisted that all of the kits were fuel filters or solvent traps (DE165:3). A solvent trap is a "device that can be attached to the

muzzle of the firearm [so] that when cleaning the firearm it can catch and capture the cleaning solvent" (*id.*). Examining the seized items, a defense expert opined that GX1A was not a "ready to go silencer" but only a "combination of parts" (DE165:4). As for GX1I and GX1J, which worked as silencers without drilling, the expert said that they could still "be used as a device to capture solvent" (DE165:5-6). On cross-examination, however, he admitted that those two devices "could be used as a silencer" right away and "would require modifications" to work as a fuel filter (DE165:11).

Rebutting this testimony, the government's expert pointed out that the devices had several features that no fuel filter or solvent trap would have (DE165:30). For example, the tubes with holes at both ends were "not a practical design at all" for trapping liquid inside them (*id.*). And none of them could work as fuel filters because the threading on the end caps fit onto gun barrels, not any engine part (DE163:60). Finally, the interior baffles and pilot holes were useful only if the kits were designed and intended to become silencers (DE163:45-46, 67-69).

## 3.   **Standards of Review**

This Court reviews the sufficiency of the evidence de novo and "consider[s] the evidence in the light most favorable to the Government, . . . drawing all reasonable inferences and credibility choices in the Government's

favor." *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013). But this Court reviews sufficiency challenges "only for plain error" if a party "didn't raise [the same argument] as a basis for granting his motion for judgment of acquittal." *United States v. Downs*, 61 F.4th 1306, 1316 (11th Cir. 2023). To prevail on plain-error review, a defendant must show (1) an error (2) that was plain and (3) that affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732-36 (1993). If he meets those conditions, then this Court may choose to correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736 (cleaned up).

When reviewing a Fourth Amendment suppression claim, this Court reviews factual findings for clear error and legal conclusions de novo. *See United States v. Evans*, 958 F.3d 1102, 1105 (11th Cir. 2020).

This Court reviews Second Amendment challenges raised for the first time on appeal for plain error. *Bolatete*, 977 F.3d at 1034-36.

## Summary of the Argument

In a quest to find the cheapest suppressors, Schieferle bought a dozen makeshift silencer kits from China. Law enforcement later searched his house and found another unregistered silencer. Schieferle asks this Court to reverse his convictions for three reasons. But he misses the mark three times.

11

Schieferle first claims that insufficient evidence supported his convictions. In his view, none of the disputed items were silencers. But a firearms expert identified the key features that made them silencers, and the jury was entitled to credit that testimony. Schieferle also says that, even if these devices were silencers, he didn't know that. Yet the jury had ample evidence to infer his knowledge. Schieferle bought the devices after watching a Youtube video about suppressors, and he had other documents on his computer that explained how to fashion homemade silencers. Given these facts and the visible features of the devices themselves, the jury could infer his knowledge and intent to use these kits as silencers. Schieferle also insists that he had no idea the shipments would come from China. Yet he never raised this last sufficiency claim below, and it fails under plain-error review. He bought the kits from a Chinese e-commerce website, and some of their product descriptions even said "China."

Next, he argues that the government did not have probable cause to justify the search warrant for his house. The warrant affidavit detailed the extensive investigation that led law enforcement to Schieferle. Among other facts, the affidavit described the two seized shipments and how overseas sellers disguised illegal silencer kits by labeling them with innocuous names. While Schieferle quibbles with how much detail the affidavit included, his hypertechnical objections cannot upset the issuing judge's practical, common-sense finding of

12

probable cause. And even if the affidavit were lacking, the good-faith exception would preserve the recovered evidence because the agents reasonably relied on the warrant.

In a last-ditch effort, Schieferle seeks shelter in the Second Amendment. The right to keep and bear arms, he argues, protects someone who imports and possesses silencers. But he never made this claim below, which means that this Court should review it only for plain error. He cannot meet that standard when no binding precedent has ever held that the Second Amendment right extends to silencers. And for good reason. Possessing silencers is not Second Amendment-protected conduct. Silencers are not "arms" at all because they are not weapons but mere accessories. And even if they counted as "arms," the Second Amendment does not protect dangerous or unusual items like silencers. History and tradition show that similar items have long been prohibited or subject to regulation.

Thus, this Court should affirm Schieferle's convictions.

## Argument

### I.    There Was Sufficient Evidence that Schieferle Possessed and Imported Silencers, and that He Knew of the Features that Made Each Kit a Silencer.

To prove Schieferle's guilt, the government had to show that the thirteen disputed kits were silencers and that he knew about the features that made those

devices silencers. The evidence on both fronts was overwhelming.

Schieferle was convicted of violating two statutes, 18 U.S.C. § 922(l) and 26 U.S.C. § 5861(d). Under § 922(l), it is a crime to "knowingly . . . import or bring into the United States . . . any firearm or ammunition," except "as provided in section 925(d) of this chapter." 18 U.S.C. § 922(l). The term "firearm" includes "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3). This law prohibits importing silencers unless a person satisfies 18 U.S.C. § 925(d), which establishes conditions for granting an import license. The jury convicted Schieferle of violating this statute twice, in Counts 1 and 2, based on the two intercepted silencer shipments.

In Count 3, Schieferle was convicted of "possess[ing] a firearm which is not registered . . . in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). Like § 922(g)(l), a "firearm" under this section includes "any silencer (as defined in section 921 of title 18)." 26 U.S.C. § 5845(a). This charge stemmed from the unregistered silencer found in Schieferle's house.

### A.    All Thirteen Devices Were Silencers Because They Had Distinctive Features Only Useful for Suppressing the Sound of a Gunshot.

Both statutes of conviction apply the definition of "silencer" found in 18 U.S.C. § 921(a). A silencer is "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or

redesigned, and intended for use in assembling or fabricating a firearm silencer." 18 U.S.C. § 921(a)(25). The government presented overwhelming proof that the disputed items met this definition.

The first December shipment (Count 1) contained ten devices. Two of them, GX1I and GX1J, worked as silencers when assembled (DE163:56-58). They consisted of a hollow outer metal tube and an inner metal baffle, a signature silencer feature. *See* (DE162:39; GX1J). When a government expert tested the device, it reduced the gunshot's noise by 17 decibels, which meant a person could fire with "no fear of hurting [his] ears" (DE162:58-59). Even Schieferle's own expert conceded that these devices "could be used as a silencer" (DE165:11).

The eight other kits from that shipment also were silencers, although they required a minor step to complete the design. They consisted of about ten pieces: a hollow metal tube, two end caps, and seven cones that fit into the tube. *See* (DE162:38; GX1A). As the government's expert explained, a person would drill through the solid end cap and the seven internal cones to create a working silencer (DE163:52-53). And anticipating this intended use, the key pieces all had a central divot to guide a drill (DE162:38; GX1A). There was no reason to have these pilot holes "other than to mark where a drill should pass" (DE163:54). And there was no other reason to have the seven cone-shaped

15

interior pieces other than to create a baffle (DE163:45-46, 67-69).

Schieferle's expert insisted that these items did not work as silencers out of the box and that they were merely, as he put it, a "combination of parts" (DE165:4). But illegal silencers include "any *combination of parts*, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer." 18 U.S.C. § 924(a)(25) (emphasis added). Thus, those eight kits also were silencers, even before anyone finished the final drilling step.

The same logic applies to the two silencers found in the second December shipment (Count 2) and the lone silencer found in Schieferle's home (Count 3). They had the same distinctive features, including baffles and pilot holes marking where to drill through their pieces. Thus, the expert concluded, those three devices also were silencers (DE163:62-64).

Schieferle rejects this obvious conclusion. In his view, these items could not be silencers because they "were marketed to the public . . . for intended uses as solvent traps and inline filters" (Br.:24). In short, he believes the jury had to take the label attached to the items at face value. Put another way, Schieferle parts ways with the famed Shakespearean question-and-answer: "What's in a name? That which we call a rose/By any other name would smell as sweet." Romeo and Juliet, act II, sc. 2. According to Schieferle, that which has all the features of an illegal silencer, but has a different name on its shipping label, is

perfectly legal.

His position is untenable. The law does not define "silencer" to mean any item marketed as a silencer or found in a box with the word "silencer" on it. A silencer is "any device for silencing, muffling, or diminishing the report of a portable firearm" and "any combination of parts . . . intended for use in assembling or fabricating a firearm silencer." 18 U.S.C. § 921(a)(25). "[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (citation omitted); *see also United States v. Caniff*, 955 F.3d 1183, 1190 (11th Cir. 2020) (observing that any typically "means 'all'" (internal quotation marks omitted)). All devices that satisfy § 921(a)(25)'s criteria, whatever they are labeled, fall within the scope of the statute.

There is no reason why an item's advertised name must dictate its intended use. Intent or knowledge can always "be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon." *Staples v. United States*, 511 U.S. 600, 615 n.11 (1994). And an item's features are often more telling proof of its intended use than the name on the label.

This jury heard ample evidence that the real intent behind these shipments was to sell illicit silencers under a deceptive name. They learned, for instance,

that Customs and Border Protection officers often see suppressors shipped from China in the guise of being "solvent trap[s]" (DE162:20). Both packages had deceptive labels, with one identifying its contents as "solvent" and the other as "adapters" (DE162:19-20, 29). And an experienced firearms expert testified that these devices were silencers by any other name because of their unique features (DE163:51-64).

These facts distinguish Schieferle's sole authority, *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010). In that out-of-circuit case, the government prosecuted a person for buying an airgun muffler, which could not fit onto a real firearm without modification. *See id.* at 97. The government conceded that it had no proof that the defendant intended to modify that airgun accessory to attach to an actual firearm. *See id.* at 99 & n.4. The government's theory, which the First Circuit rejected, was that the statute requires only "a potential for adaptation and knowledge of [that potential.]" *Id.* at 97.

Here, in contrast, the prosecution's theory was not that Schieferle bought items with a potential for adaptation but with no intent to fashion them into silencers. Instead, the government showed—through the evidence discussed above and in Part II.B, *infra*—that Schieferle and the seller intended for these items to work as silencers. To be sure, Schieferle's expert disagreed. But resolving factual questions about intent or deciding which expert to credit are

quintessential jury tasks, and the jury correctly found that these items were silencers.

**B.    Schieferle Knew of the Features that Made These Items Silencers.**

To prove a defendant violated § 5861(d), the government must show that he "knew of the features of [the item] that brought it within the scope of the Act." *Staples*, 511 U.S. at 619. In the same vein, § 922(l) requires that the defendant "knowingly" imported silencers. The government proved that Schieferle knew that these kits had the key features of silencers.

First, the chronology allowed the jury to infer his knowledge and intent. In November 2020, Schieferle's computer accessed a video called "The Cheapest Suppressor" (DE162:117; GX12). That video described baffles as the pieces that "make the suppressor magic work" (GX12). He ordered both shipments, which arrived in late November and early December 2020, after watching that video.

Second, Poor Man's James Bond, also found on his computer, taught him how to recognize a silencer (GX18; GX19). In particular, one article identified a silencer's core features: "a series of sleeves, baffles, and absorbent materials enclosed in a tube with an opening for the barrel at one end and an exit hole for the bullet at the other" (GX18:3). Notably, the order pages for Schieferle's purchases include illustrations with baffles much like the ones in Poor Man's James Bond:

19



*Compare* (GX18:4), *with* (GX26).

That manual did more than just explain the basic design principles behind most silencers. It also warned that "if you are caught in possession of one, it will almost certainly get you a lengthy stay in a Federal prison" (GX18:2). At several points, it called these devices "illegal" (*id.*). And although Schieferle did not heed the warning, the article concluded with: "The Federal Government has a number of penitentiaries scattered around the country just waiting for people that they catch with something like what is described in this book" (GX18:16).

Third, the items' physical features made their intended use readily apparent. *See Staples*, 511 U.S. at 615 n.11 (observing that "external indications signaling the nature of the weapon" support a finding of knowledge). As shown above, *see* (GX26), Schieferle ordered items that had internal baffling, a key characteristic of a silencer. Two of the items had openings on both ends, making them useless as a fuel filter or solvent trap. And the others had pilot marks

20

showing where to drill to create a hollow passage. Notably, Schieferle was watching the price of drill bits on Amazon (GX36). The seized items also had the right threading to fit onto AR-15 rifles just like the ones Schieferle owned (DE163:60, 64-65). As one agent remarked, the silencer found in Schieferle's house "looked nearly identical to the one [he was] issued" with his government firearm (DE162:94). Nothing except a silencer would have all of these features and look exactly like a silencer.

Finally, the quantity of these kits suggested that Schieferle intended to use them as silencers. A solvent trap is a cleaning device, which an owner would switch back and forth between different guns. *See* (DE165:31) ("The Court: In your experience with firearms is it common to have in excess of ten or so solvent traps. [Expert] witness: No, Your Honor, it would not be common at all."). In contrast, it would make more sense to have thirteen silencers because each one could match up with a different gun. And Schieferle had many guns, including AR-15 rifles, at home (DE162:60-65). Thus, it was fair to infer that he was buying enough silencers for his large collection of firearms.

Against this strong evidence, Schieferle offers three retorts. First, he claims that nothing proved that he saw the "Cheapest Suppressor" video or Poor Man's James Bond documents (Br.:29). But those files came from Schieferle's own computer. "Jurors are entitled—indeed, expected—to make inferences based on

common sense." *United States v. Caldwell*, 81 F.4th 1160, 1176 (11th Cir. 2023). And on appeal, this Court draws all reasonable inferences in the verdict's favor. *See Capers*, 708 F.3d at 1296. Thus, the Court should infer, as this jury likely did, that Schieferle viewed and read something found on his computer. *See, e.g.*, *United States v. Benjamin*, 958 F.3d 1124, 1130-32 (11th Cir. 2020) (relying in part on defendant's search history to reject a sufficiency claim).

Second, Schieferle undersells the significance of these devastating documents, claiming they would not show his knowledge "[e]ven assuming . . . that [he] had viewed the video and the relevant passages of the book" (Br.:29). Of course, he never quotes the passages described above. Those parts identified the key features of a silencer like baffles—features shared by the items he ordered—and also warned him against making these devices.

Third, Schieferle invokes *United States v. Moore*, 253 F.3d 607 (11th Cir. 2001), but that case does not help him. That defendant tacitly admitted that he knew the disputed items were silencers. *See id.* at 611. That's certainly one way to prove knowledge. But *Moore* does not mean that the government must get a confession to prosecute gun crimes. Here, there were different but equally powerful facts that established Schieferle's knowledge—including "the condition of the object[s]" themselves, which the *Moore* Court highlighted as one

22

way to prove this element. *Id.* at 611. Viewing the evidence in the light most favorable to the verdict, there was comprehensive proof of Schieferle's guilt.

### C.    Under Plain-Error Review, the Government Proved that Schieferle Knew the Silencers from Counts 1 and 2 Came From Outside the United States.

Schieferle also raises a new challenge to his § 922(l) convictions. According to him, the government never proved that he knew the two intercepted shipments would come from outside the United States (Br.:32-33).

Yet Schieferle never made this argument in the district court. In his midtrial Rule 29 motion, Schieferle argued only that there was no proof he "intended to use [these devices] as a silencer" (DE163:101). And his post-judgment motion for acquittal echoed the same point (DE115). Thus, plain-error review applies. *See Downs*, 61 F.4th at 1316.

He cannot surmount this more challenging standard, which he never acknowledges or addresses. Schieferle ordered these items from Ali Express, a well-known e-commerce website "similar to Amazon" but "based in China" (DE162:73). The order details for several items expressly described them as "type 3 BLACK+China" or "type 1 black+China" (GX29):



Given these facts, it was not plain error for the jury to find that Schieferle knew he was importing these items.

## II. The District Court Did Not Err by Declining To Suppress Evidence Found During a Warrant-Authorized Search of Schieferle's House.

After intercepting Schieferle's silencer orders, law enforcement sought a search warrant for his house. Schieferle contends that there was no probable cause to support that warrant. But there was. The suspicious shipments and other facts about Schieferle's activities gave rise to probable cause. And in any event, even if the warrant fell short, the good-faith exception would apply.

### A.    Background

In December 2020, a federal agent applied for the warrant based on suspected violations of 18 U.S.C. § 545 and 26 U.S.C. § 5844, 5861(k), and 5871 (DE38-1:5). Section 545 makes it a crime to "knowingly import[] or bring[] into the United States[] any merchandise contrary to law." 18 U.S.C. § 545. The other cited statutes, parts of the National Firearms Act, criminalize "receiv[ing] or possess[ing] a firearm which has been imported or brought into the United States in violation of section 5844." 26 U.S.C. § 5861(k). As discussed above, the grand jury ultimately indicted Schieferle on different but similar charges. Section 922(l) (Counts 1 and 2) is a firearms-specific import prohibition,

24

and § 5861(d) (Count 3), another section of the National Firearms Act, criminalizes possessing an illegal silencer (DE3).

To show probable cause, the affidavit recounted how Customs officers intercepted Schieferle's two international packages, which contained twelve suspected silencers (DE38-1:8-9). The packages came from "addresses known to law enforcement to be associated with suppressor shipments" (DE38-1:6). The first shipment was labeled "solvent," while the second was labeled "adapter" (DE38-1:8). Schieferle worked as a federal air marshal, but "nothing in [his] employment file" suggested that these orders were "connected to his employment" (DE38-1:9).

The affidavit disclosed that the devices did not work as silencers without modification. The suspected "suppressors are capped on one end," so a buyer must "drill through the suppressor to allow the round to be projected through" (DE38-1:6). Yet the affiant concluded the kits were still silencers: "While the assembly of these suppressor[s] is incomplete, the features and characteristics of the parts are consistent with those of known firearm suppressors" (DE38-1:6 n.1).

The affidavit based this finding on a 2019 Homeland Security report, which explained how to identify a disguised silencer (DE38-1:7). Relying on that report's teachings, the affiant concluded that the disputed devices were

25

"combination[s] of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer" (*id.*) (internal quotation marks omitted).

The affidavit also explained that sellers label these shipments "as auto repair tools, fuel filters, adapters, . . . solvent filters, and other misleading titles to avoid detection of their actual intended use" (DE38-1:7). The affidavit acknowledged that these items "are marketed on the Internet" as "solvent traps" but observed that this marketing is "deceptive" (*id.*). Between May and December 2020, Schieferle had received eighteen shipments from China (DE38-1:8). And two of those packages also declared that they held "adapters" (*id.*).

The affiant confirmed that Schieferle did not have a license or National Firearms Act "tax stamps, which are necessary to legally import suppressors" (DE38-1:9). Nor did he "file the appropriate forms or obtain approval from [the Bureau of Alcohol, Tobacco, Firearms and Explosives] that would allow him to legally receive the suppressor shipments" (*id.*). The affidavit then described the ATF Form 1, the application to make a silencer (*id.*). The affidavit also noted that "defense articles cannot be imported into the U.S. from China because of section 447.52(a) of the Arms Export Control Act" (DE38-1:9). *See* 27 C.F.R. § 447.52(a).

Schieferle moved to suppress the evidence obtained through this warrant,

and the district court referred his motion to a magistrate judge (DE38). Schieferle claimed that his "specific intent" was "not alleged directly or circumstantially in the affidavit" (DE38:6). As he maintained at trial, Schieferle insisted that he "did not possess something illegal" because the items were not silencers until "assembled or fabricated by someone with intent" (DE38:7). In short, "the solvent traps are not silencers until the hole is drilled for a bullet to pass through" (DE38:9). Also, although the affidavit described ATF Form 1, that form pertains to making a silencer, not registering the purchase or import of a ready-made silencer (DE38:6; DE63:5).

In a single line, Schieferle suggested that, "[t]o the extent that the [issuing judge] could have misinterpreted the allegations based upon semantics in the search warrant affidavit," that misunderstanding could "justify a *Franks* hearing" (DE38:5 & n.2). A *Franks* hearing addresses whether to invalidate a search warrant because the affiant intentionally or recklessly misrepresented or omitted facts necessary to the warrant's probable cause showing. *See Franks v. Delaware*, 438 U.S. 154 (1978).

In response, the government spotlighted two critical flaws in Schieferle's arguments (DE43). First, the cited criminal laws extend to collections of parts that are "designed or redesigned, and intended for use in assembling or fabricating a firearm silencer" (DE43:6) (quoting 18 U.S.C. § 921(a)(25)). Thus,

he was wrong about when these items became illegal. Based on their included parts and deceptive labeling, "there was probable cause to believe that the so-called solvent traps were designed and intended for use in assembling a silencer" (DE43:8). Thus, even before being drilled and assembled, they qualified as illegal silencers (*id.*).

Second, the affidavit alleged facts suggesting "that the Defendant intended to convert the so-called solvent traps into silencers" (DE43:10). For instance, the defendant placed at least eighteen orders from China in about seven months. Two of those orders were labeled "solvent" and "adapters," but the contents contained all the pieces needed to make a silencer. And two other packages that Schieferle ordered earlier in November 2020 also were labeled as "adapters." Yet Schieferle never obtained approval to import silencers (*id.*).

The government admitted that the affidavit contained a mistake. Instead of describing ATF Form 1, the affidavit should have referred to ATF Form 6 (DE155:43-44). That said, the affidavit still alleged in more general terms that Schieferle did not obtain the tax stamps and prior ATF approval needed to import silencers (DE38-1:9; DE54:3).

As to the *Franks* issue, Schieferle "failed to make any substantial preliminary showing that a false statement was made, either knowingly and intentionally or with reckless disregard for the truth" (DE43:11). The affidavit

28

disclosed all material facts to the issuing judge, including that the seized items "required an additional step to form them into fully functional silencers" (DE43:12). Finally, the government added, the good-faith exception allowed the prosecution to use the seized evidence even if the warrant were deficient (DE43:11) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

In his reply, Schieferle argued that the affidavit contained intentional falsehoods or omissions under *Franks*, which foreclosed the good-faith exception (DE45). According to him, "[f]ailing to explain that *not* all solvent traps are silencers, the degree of modifications that must be made . . . and [how] one cannot apply for a license before purchase is a reckless disregard for the truth" (DE45:4) (emphasis in original).

After hearing argument, the magistrate judge issued a report and recommendation rejecting Schieferle's arguments (DE74). As the report noted, probable cause "is not a high standard of proof" (DE74:7). Also, "review of the issuing judge's finding of probable cause is deferential" and hinges on whether that judge had a "substantial basis" to believe probable cause existed (DE74:8) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)).

Under that standard, the affidavit's probable cause showing was sufficient (DE74:11-15). Although the affidavit did not expressly allege that Schieferle intended to convert the kits into silencers, it showed "probable cause that the

29

products were being imported with the intent that *someone* would take that step" (DE74:11) (emphasis in original). The report noted that "approximately twenty packages had been shipped to Defendant's home from Chinese vendors known to law enforcement to sell parts commonly modified to function as suppressors," that officers "inspected two of those packages and found multiple suppressors in each," and that a similar package "was delivered to Defendant's home just a couple weeks before the Warrant was issued" (*id.*). On top of that, the intercepted packages "were labeled like other shipments the government had identified as containing suppressors" (*id.*). Schieferle's job as an air marshal also allowed the issuing judge to "reasonably infer that [he] had an interest in firearms [and] was trained and knowledgeable about them" (DE74:12).

The magistrate judge discussed the affidavit's "non sequitur" in referring to ATF Form 1 (DE74:12-13). Despite that mistake, the application also said that Schieferle had no import license or tax stamps, and that he did not "file the appropriate forms or obtain approval from ATF" (DE74:14). The magistrate judge criticized these statements for failing to accurately "identify the appropriate forms or means of ATF approval" (*id.*) (internal quotation marks omitted). Even with these shortcomings, though, the report concluded that the issuing judge had a "substantial basis" for finding probable cause (DE74:14-15).

In the alternative, the report concluded that the good-faith exception

applied (DE74:15-19). Although Schieferle argued that *Franks*-style misrepresentations or omissions barred the government from relying on that exception, he "plainly did not meet this burden" (DE74:18). Aside from "conclusory" allegations, Schieferle failed to identify any falsehoods in the affidavit (*id.*). And he never showed that any purported misstatements or omissions were "essential to the finding of probable cause" (*id.*).

Schieferle objected to this report (DE76), but the district court adopted it and denied his suppression motion before trial (DE89; DE160:2).

### B. Schieferle's Two Shipments of Illegal Silencers Gave Rise to Probable Cause Supporting the Search Warrant for His House.

Probable cause requires only "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. This standard is a "practical, nontechnical conception" based on "the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Id.* at 231 (internal quotation marks omitted). Probable cause is "not a high bar," *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal quotation marks omitted), and it does not demand proof by a preponderance or any precise "quantification into percentages," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

When reviewing a warrant, this Court's scrutiny "should not take the form of de novo review." *Gates*, 462 U.S. at 236. The issuing judge's probable cause

31

finding "should be paid great deference" and upheld "as long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing." *Id.* (cleaned up).

The warrant application clears this threshold. It summarized the thorough investigation of two illegal silencer shipments from China to Schieferle. After consulting internal agency guidance, investigators confirmed that the seized devices were likely illegal silencer kits (DE38-1:7). The packages bore deceptive labeling, claiming their contents were "solvent" or "adapters" (DE38-1:8). Based on prior experience, however, the agent knew that the sender addresses were "associated with suppressor shipments" (DE38-1:6).

The agent also uncovered facts about Schieferle that suggested he knowingly ordered silencers without obtaining an import license. Although he was a federal air marshal, his job did not require him to buy silencers (DE38-1:9). Other records requests revealed that he had no import license, had not paid for tax stamps, and "did not file the appropriate forms or obtain approval from ATF" (DE38-1:9). And perhaps most concerning, Schieferle had ordered eighteen other packages from China since May 2020, with the most recent ones arriving weeks earlier in November 2020 (DE38-1:8). At least two of those

packages also identified their contents as "adapters," suggesting an intent to conceal their true nature (*id.*).

In fairness, the affidavit also disclosed facts consistent with innocent conduct. It acknowledged, for instance, that the seized devices would not work as silencers without "drill[ing] through the suppressor" (DE38-1:6). It also informed the issuing judge that the labels identified these items as innocuous "fuel filters" or "solvent traps" (DE38-1:7-8). In the same vein, the affidavit acknowledged that similar items "are marketed on the Internet as items purportedly unrelated to firearms" (DE38-1:7).

Even so, there was a "fair probability" of discovering evidence of gun importation crimes at Schieferle's house. *Gates*, 462 U.S. at 238. Schieferle ordered a dozen items that, in the agent's training and experience, were disguised silencers, from Chinese merchants known for selling illegal silencers. Anyone with "common-sense judgment[]" could infer that the person buying all these items intended to use them as silencers. *Id.* at 236. Thus, even though the affidavit did not expressly discuss Schieferle's knowledge or intent, the alleged facts established probable cause as to that element.

Schieferle resists this showing for four reasons, none of them persuasive.

a.  Schieferle first claims that "possessing products that could be used to create a silencer, even with intent to later fabricate them to serve as a silencer, is

33

not illegal" (Br.:37). In his view, if people can submit an ATF Form 1 to make a silencer, it must be legal to possess some of the constituent parts beforehand (Br.:36-37). But no one can buy an unregistered make-your-own-silencer kit containing all the essential pieces of a suppressor. A law-abiding person may, for instance, buy a muffler designed to work as a car part and then *later* file an ATF Form 1 when they want to convert it into a silencer. The nature of the design and the timing of the intent are critical distinctions. Here, in contrast to that posited scenario, the issuing judge could infer that these kits were designed and intended *from the outset* to become silencers. That purpose makes every shipped kit an illegal "combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer," 18 U.S.C. § 924(a)(25)—even before anyone drilled through the pieces.

b.   On a related note, Schieferle denies that the affidavit showed he intended to assemble the kits into silencers (Br.:37). But a warrant application need not expressly allege a defendant's intent. *See United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985) ("intent . . . normally must be inferred from circumstantial evidence"); *United States v. Williams*, 459 F.2d 909, 913 n.4 (6th Cir. 1972) (observing that a warrant may establish probable cause "by reasonable inference from the facts and circumstances" and does not require "a direct and specific showing with respect to [each] necessary element[]"). The

34

affidavit quoted the critical language defining "silencer," so the issuing judge understood that the shipments were illegal only if "intended for use in assembling or fabricating a firearm silencer" (DE38-1:7). And even without expressly alleging intent, the affidavit detailed circumstances supporting the inference that Schieferle intended to convert these items into silencers. *See* pages 32-33 *supra*.

c.    Schieferle also highlights that the warrant identified different suspected offenses—18 U.S.C. § 545 and 26 U.S.C. § 5861(k)—than the charges in the indictment. He contends that the government did not establish probable cause for these import-related offenses (Br.:43-44). As part of this argument, he faults the government for discussing ATF Form 1 instead of the correct ATF Form 6 (*id.*).

The government acknowledges that mistake, but it is not fatal to the probable cause showing. Section 545 prohibits any imports "contrary to law," while 26 U.S.C. § 5861(k) criminalizes receiving silencers imported "in violation of [26 U.S.C. §] 5844." The affidavit alleged that these imports were contrary to law in several ways. Schieferle had no license to import or deal in firearms, nor did he pay for tax stamps under the National Firearms Act, "which are necessary to legally import suppressors" (DE38-1:9). He also "did not file the appropriate forms or obtain approval from ATF that would allow him to legally receive the

suppressor shipments in this case" (*id.*). And finally, importing defense articles from China violates the Arms Export Control Act (*id.*).

Leaving aside the mention of ATF Form 1, those three allegations showed that Schieferle could not legally import silencers. Indeed, this point was so uncontroversial that he later stipulated to it at trial (DE163:99-100). Insisting on more detail is the type of "hypertechnical" objection that cannot undermine a warrant. *Gates*, 462 U.S. at 236 (internal quotation marks omitted).

d.   Schieferle also complains that "the issuing court was not advised of the legitimate functions that the items at issue could serve" (Br.:38). But there is no reason to believe that the issuing judge failed to grasp this point. On the contrary, the affidavit suggests that fuel filters or solvent traps are legal items. Several paragraphs discuss how sellers label silencer kits as fuel filters or solvent traps to disguise their true intent, which both suggests that the illicit articles resemble fuel filters and that fuel filters are legal to own (DE38-1:7). Thus, a common-sense reading of the affidavit dispels his concern.

As a broader point, Schieferle cannot undermine the warrant by micromanaging the affidavit's specificity. For example, he cites *United States v. Hay*, 46 F.4th 746 (8th Cir. 2022), and insists that this warrant should have looked more like the one reviewed there. For one thing, the warrant in *Hay* appears very similar to this one, *see id.* at 748-49, so that case helps the

government's cause. But leaving that aside, Schieferle relies on flawed logic when he claims that any warrant that falls short of *Hay* is insufficient. *See United States v. Knights,* 534 U.S. 112, 117 (2001) (rejecting the "dubious logic . . . that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it"). Again, this brand of "hypertechnical" nitpicking contradicts the standard of review. *Gates*, 462 U.S. at 236 (internal quotation marks omitted).

### C. The Good-Faith Exception Applies Because Law Enforcement Reasonably Relied on This Warrant.

Even if the Court concludes that the warrant is deficient, suppression is not the right remedy. "[C]ourts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002); *see generally United States v. Leon*, 468 U.S. 897 (1984).

The exclusionary rule is a judge-made remedy. Since its "sole purpose . . . is to deter future Fourth Amendment violations," courts should not suppress evidence if exclusion "fails to yield appreciable deterrence" or if "the deterrence benefits of suppression [fail to] outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (internal quotation marks omitted). When the

police believe that they have a valid search warrant, but they turn out to be wrong, "the deterrence rationale loses much of its force" and exclusion "cannot pay its way." *Leon*, 468 U.S. at 907 n.6, 919 (internal quotation marks omitted).

In *Leon*, the Supreme Court laid out four situations in which the good-faith exception should not apply. And Schieferle invokes two of them here. Good faith cannot save a warrant if the application was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (internal quotation marks omitted). Nor can good faith save a warrant based on intentional falsehoods or omissions that violate *Franks*. *See Leon*, 468 U.S. at 914. When assessing good faith, this Court starts by asking whether the case fits within one of those carveouts. *See United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021). If "none of these four circumstances exists," then the Court "proceed[s] to determine whether the executing officer reasonably relied upon the search warrant." *Id.* (internal quotation marks omitted).

This case does not fall into the first category. Even assuming the affidavit failed to show probable cause, it would present a close call. Indeed, three federal judges—the district judge, the magistrate judge, and the original issuing judge—believed the warrant to be sufficient. For the reasons explained above, *see* Part II.B *supra*, a reasonable officer could believe that he had probable cause.

Schieferle focuses most of his fire on the *Franks* exception. But as the

38

district court correctly found, he "plainly did not meet []his burden" under *Franks* (DE74:18). When a defendant alleges a *Franks* violation, he must make a "substantial preliminary showing" that (1) "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included . . . in the warrant affidavit," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. As to the first prong, "negligence or innocent mistake[s] are insufficient," and the defendant's "attack must be more than conclusory." *Id.* at 171. And as to the second, the key question is whether probable cause would exist even after correcting the purported misrepresentations or omissions. *See United States v. Moon*, 33 F.4th 1284, 1301 (11th Cir. 2022).

Schieferle fails on both fronts. Aside from conclusory attacks, Schieferle does not point to specific misrepresentations or omissions, much less provide any proof that the officer made them intentionally or recklessly. A *Franks* showing is not easy to make. Normally, it requires a defendant to "point out specifically the portion of the warrant affidavit that is claimed to be false" and offer "a statement of supporting reasons." *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006) (internal quotation marks omitted).

In lieu of that showing, Schieferle repeats the same claims that "the affidavit wholly failed to inform the issuing court that solvent traps and inline

fuel filters can serve legitimate purposes" and that "a person could possess such items, even with intent to modify them to serve as silencers" (Br.:46). And those claims fail for the same reasons explained above. *See* Part II.B.a & d *supra*.

Apart from that shortcoming, Schieferle has never tried to show that any purported misstatements or omissions were "essential to the finding of probable cause" (DE74:18). Nor can he. If anything, correcting the affidavit's minor omissions or mistakes would enhance, not detract from, the government's probable cause showing. For instance, if the affidavit correctly described the ATF Form 6 and explained that Schieferle never submitted that form, that fact would bolster the probable cause showing.[1]

Because neither carveout to the good-faith exception applies, the only remaining question is whether the agent reasonably relied on the warrant. *Morales*, 987 F.3d at 974. He did. As the application shows, the agent conducted a careful, multi-step investigation before seeking the warrant. He considered possible justifications for Schieferle's conduct, including searching for whether Schieferle had permission to import these items or might have ordered them for

---

[1] While addressing good faith, Schieferle says in passing that the district court erred by not holding a *Franks* hearing (Br.:47). Even if this stray line is enough to raise a separate claim, it fails. Without a substantial showing of material falsehoods, the district court need not hold a hearing. *See Moon*, 33 F.4th at 1301.

his work as an air marshal. Under these circumstances, the good-faith exception should apply.

## III. Schieferle's Statutes of Conviction Are Not Plainly Unconstitutional Under the Second Amendment.

For the first time on appeal, Schieferle claims that the Second Amendment shields his offense conduct (Br.:48-52). But he fails to apply the right standard of review and ignores several pertinent precedents. And even if this Court reviews this claim de novo, the Second Amendment does not protect silencers because those devices are not "arms" commonly used for lawful purposes.

### A. Under Plain-Error Review, Schieferle Cannot Show that 18 U.S.C. § 922(l) or 26 U.S.C. § 5861(d) Are Unconstitutional.

To start, this Court should review Schieferle's argument for plain error. Three years ago, this Court addressed a very similar Second Amendment challenge in *United States v. Bolatete*, 977 F.3d 1022 (11th Cir. 2020). That defendant argued for the first time on appeal that the Second Amendment protected the right to possess a silencer. *Id.* at 1036. Like Schieferle, he insisted that silencers are "typically possessed by law-abiding citizens for lawful purposes." *Id.* But he did not raise the argument below, so "the strictures of plain error review defeat[ed] his belated contention." *Id.*

"When neither this Court nor the Supreme Court have resolved an issue, there can be no plain error[.]" *United States v. Vereen*, 920 F.3d 1300, 1312 (11th

Cir. 2019). And "[n]either this Court nor the Supreme Court has ever held that silencers are 'typically possessed by law-abiding citizens for lawful purposes.'" *Bolatete*, 977 F.3d at 1036 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 625 (2008)). "In fact, neither Court has ever decided the preliminary question of whether silencers are 'Arms' for Second Amendment purposes." *Id.*

That reasoning applies with equal force here. Schieferle never filed a motion to dismiss his indictment on Second Amendment grounds. Nor did he make this argument during or after trial. And while he stakes his belated claim on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), that decision came out in June 2022—more than five months before his December 2022 trial. In short, he had every opportunity to raise this claim below. Thus, plain-error review applies.

After *Bruen*, *Bolatete*'s reasoning still holds true. *Bruen* addressed a challenge to a state law that curtailed law-abiding citizens' right to own handguns. *See* 142 S. Ct. at 2122. That case had nothing to do with silencers, and the words "silencer" or "suppressor" never appear in the majority or dissenting opinions. To this day, "[n]either this Court nor the Supreme Court has ever held that silencers are typically possessed by law-abiding citizens for lawful purposes." *Bolatete*, 977 F.3d at 1036 (internal quotation marks omitted). Nor has either Court "decided the preliminary question of whether silencers are

'Arms' for Second Amendment purposes." *Id.* And "[b]ecause there is no on-point precedent . . . supporting [Schieferle]'s belatedly asserted position, the district court's not raising the issue on its own and striking down the statute cannot be plain error." *Id.*

### B. Silencers Are Not Arms Commonly Used by Law-Abiding Citizens for Lawful Purposes and Thus Fall Outside the Scope of the Second Amendment.

Because plain-error review applies, the absence of on-point precedent is enough to reject Schieferle's claim. This Court should not delve into the merits of this question, especially in an expedited appeal. But if it does, it will find the argument wanting for three reasons.

a. Silencers are not "arms" for Second Amendment purposes. The Second Amendment safeguards "the right of the people to keep and bear Arms." U.S. Const., amend. II. That right applies to "bearable arms," and "the most natural reading of 'keep Arms'" means "to 'have weapons.'" *Heller* 554 U.S. at 582. At its far reaches, the Second Amendment may extend to items, like magazines and ammunition, essential to exercising the right to keep and bear weapons. *See, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Even then, the Constitution does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

43

Unlike a magazine, a silencer is not essential to making a gun operable. Nor does it serve any lawful purpose like self-defense or hunting. In fact, Schieferle's Poor Man's James Bond makes this exact point. In its telling, the "only . . . thing a silencer is actually suited for is to kill someone at a distance without making a lot of noise," and they "do not have any practical use as a hunting or target weapon" (GX18:2). As another appellate court has pointed out, a "silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence')." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Thus, the Second Amendment does not extend to these devices. *See id.*

According to Schieferle, *Bruen* implies that silencers are protected arms (Br.:50). He reads a lot into very little. *Bruen* never mentions silencers and has nothing to do with gun accessories as a broad category. When *Bruen* noted, as *Heller* did before it, that the word "arms" covers some weapons not "in existence in the 18th century," *Bruen*, 142 S. Ct. at 2132, it was contemplating modern advancements like automatic handguns, not accessories like silencers. The Second Amendment "protects the possession and use of *weapons* that are in common use at the time." *Id.* at 2128 (emphasis added); *see also id.* at 2134-35. And to state the obvious, a silencer is not a weapon. In fact, the only opinion Schieferle identifies that discusses this specific question rules against him. *See*

*United States v. Saleem*, --- F. Supp. 3d ----, 2023 WL 2334417, at *8-9 (W.D.N.C. Mar. 2, 2023).[2]

b.    Even assuming that silencers are Second Amendment "arms," regulating silencers is consistent with the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. In *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court upheld the National Firearms Act's constitutionality, as applied to a sawed-off shotgun, shortly after Congress passed that law. The National Firearms Act is one of the statutes at issue here. *See* 26 U.S.C. § 5861(d). Interpreting that decision about eighty years later, *Heller* "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625.

*Bruen* emphasized this point when conducting its historical analysis. Under *Bruen*, a law that burdens protected conduct is permissible if "'historical precedent' from before, during, and even after the founding evinces a

---

[2]    The emerging post-*Bruen* consensus confirms that "silencers are not weapons and therefore cannot be 'bearable arms' protected by the Second Amendment." *United States v. Cooperman*, 2023 WL 4762710, at *1 (N.D. Ill. July 23, 2023); *see also United States v. Peterson*, 2023 WL 5383664, at *1-2 (E.D. La. Aug. 21, 2023); *Cox v. United States*, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023); *United States v. Villalobos*, 2023 WL 3044770, at *11-12 (D. Idaho Apr. 21, 2023); *United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023).

comparable tradition of regulation." 142 S. Ct. at 2131-32. The Court took pains to stress that it was evaluating whether New York could bar "ordinary, law-abiding citizens" from "carry[ing] handguns publicly for their self-defense." *Id.* at 2122. Handguns, of course, are in "common use," and thus protected by the Second Amendment. *Id.* at 2134; *see also Heller*, 554 U.S. at 624 (same). On that basis, *Bruen* distinguished the problematic state law from the long "historical tradition of prohibiting the carrying of dangerous and unusual weapons." 142 S. Ct. at 2128 (internal quotation marks omitted); *see also id.* at 2142-43 (analyzing Colonial-era Massachusetts and New Hampshire acts that outlawed "rid[ing] or go[ing] armed Offensively").

Reading *Miller*, *Heller*, and *Bruen* together, the dangerous and uncommon weapons regulated by the National Firearms Act—things like machine guns, sawed-off shotguns, and silencers—fall outside the Second Amendment's ambit. The common law never allowed the people to possess any type of weapon or gun accessory they wanted, regardless of how unusual or dangerous it might be. *See Heller*, 554 U.S. at 626. For example, under English common law, "the offence of riding or going armed, with dangerous or unusual weapons, [was] a crime." 4 William Blackstone, *Commentaries on the Laws of England* 148-49. In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual

46

weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (N.C. 1824). *See also Bruen*, 142 S. Ct. at 2143 (identifying Colonial-era statutes in the same vein). This limitation is why no one claims a Second Amendment right to drive around in a tank or have a working cannon in their front yard. *See United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that "pipe bombs are not typically possessed by law-abiding citizens for lawful purposes"); *see also United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (same as to silencers).

The evidence here confirms that silencers are not common items used for lawful purposes. To return to Poor Man's James Bond, silencers "do not have any practical use" and, "unless you plan to assassinate someone, you very probably don't have any business" owning one (GX18:2, 16). And while Schieferle suggests that they are in common use today (Br.:51-52), he did not present any of this evidence in the district court. So this Court has no record to evaluate his challenge—yet another reason not to entertain it on plain-error review.[3]

---

[3]    History suggests that the public recognized silencers as dangerous objects shortly after their invention. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 246-49 (2020). When they reached the market in the early 1900s, "[o]bjections to civilian use of silencers appeared almost immediately." *Id.* at

c.    Finally, the criminal statutes at issue do not prevent a person from possessing silencers and so they do not "infringe[]" on the right to keep arms. U.S. Const., amend. II. Laws that regulate firearms licensing or commerce do not violate the Second Amendment. *See Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (discussing laws that require licensing or training to buy a gun).

People can legally own and transfer silencers if they follow the law's registration and taxation requirements. *See generally* 26 U.S.C. Ch. 53. Schieferle didn't import these items from China because that was his only way of exercising his purported constitutional right to a silencer. He could have paid $200 to $1,000 for legal, registered silencers (DE162:44). He chose to buy these silencer kits because they cost $25 each and he wanted the "[c]heapest [s]uppressor[s]" he could find (DE162:117; DE163:80). The Second Amendment protects a common-law right; it is not a lowest price guarantee.

Laws that tax or regulate firearms sales have close analogues in our nation's historical traditions. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History*

---

246. Many states either banned or regulated their possession, including Louisiana, North Carolina, Pennsylvania, and Wyoming. *Id.* at 247-48 & n.123.

*in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* And in the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. In a similar vein, Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id.* at 685 n.18.

Meanwhile, other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685. State laws regulated "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. Spitzer, *Gun Law History* at 74. In 1814, for example, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested" before sale. *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.*

Like these early laws, the National Firearms Act's registration and taxation requirements for silencers—and § 922(l)'s limits on imports—do not prohibit possessing or even transferring silencers. Instead, the statutes at issue merely limit the universe of legal dealers and impose record-keeping requirements that ensure safety. Although neither criminal provision is identical to these historical statutes, *Bruen* explained that the government need only

identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133 (emphases omitted). And those statutes evince a similar purpose: regulating sales to ensure public safety.

For all these reasons, the Second Amendment does not shield Schieferle's conduct and provides no basis to reverse his convictions.

## Conclusion

This Court should affirm Schieferle's convictions.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By:    s/ *Jason Wu*
Jason Wu
Assistant United States Attorney
99 N.E. 4th Street, #500
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Of Counsel

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,033 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-based typeface using Microsoft Word 2016, 14-point Calisto MT.

## Certificate of Service

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 24th day of October 2023, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Jason Jervis Wise, Esq., counsel for David Schieferle.

s/ *Jason Wu*
Jason Wu
Assistant United States Attorney

*cbe*